# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
November 4, 2009 Session Heard at Memphis

## STATE OF TENNESSEE v. SHAWN HATCHER

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 01-09093-95      W. Otis Higgs, Judge**

---

**No. W2006-01853-SC-R11-CD - Filed May 4, 2010**

---

We granted permission to appeal in this case in order to consider whether Tennessee Rule of Criminal Procedure 33 permits a defendant to amend his motion for new trial after the hearing on the initial motion has been conducted and an order denying the motion has been entered. In this case, newly-appointed defense counsel filed several pleadings seeking to add grounds in support of a new trial after the hearing on the original motion for new trial had been held and an order denying a new trial had been entered. The trial court considered the new grounds and subsequently entered a second order denying a new trial. The defendant appealed. The Court of Criminal Appeals refused to consider any issues raised after the trial court denied the original motion for new trial. As to the issues that were raised in that motion, the Court of Criminal Appeals determined that the defendant is not entitled to relief. We have concluded that trial courts should not permit the defense to amend its motion for new trial after the new trial hearing has been held and an order denying a new trial has been entered. Further, we have reviewed an issue the defendant properly preserved and have reviewed for plain error the issues the defendant failed to preserve but argues to this Court. We hold that the defendant is not entitled to relief on any of these issues and therefore affirm the judgment of the Court of Criminal Appeals.

**Tenn. R. App. P. 11; Judgment of the**
**Court of Criminal Appeals Affirmed**

CORNELIA A. CLARK, J., delivered the opinion of the Court, in which JANICE M. HOLDER, C.J., GARY R. WADE, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Lance R. Chism (on appeal) and Brett Stein (at trial), Memphis, Tennessee, for the appellant, Shawn Hatcher.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; J. Ross Dyer, Senior Counsel; William L. Gibbons, District Attorney General; and P. Thomas

Hoover and Michelle Parks, Assistant District Attorneys General; for the appellee, the State of Tennessee.

## OPINION

## Factual Background

This case arises from Shawn Hatcher's participation in the shooting death of Marcel Mackey and the gunshot injuries to Anitra Flowers and Randall White/Moore ("Red")[1] on April 3, 2001, in Memphis, Shelby County, Tennessee. Shawn Hatcher ("Defendant") was charged with alternative counts of first degree premeditated murder and first degree felony murder, and two counts of attempted first degree premeditated murder.[2] Also charged were Defendant's older brother, Christopher Hatcher ("Chris"), and Defendant's friend, Cornelius Jefferson ("Cornelius").[3] Defendant was tried individually before a jury in January 2005.

The proof at trial established that Defendant, seventeen years old at the time, was released from juvenile custody on the afternoon of April 3, 2001. That evening, Defendant, Cornelius, and a man named Dan Smith accompanied Chris to an apartment at 756 East Raines. There, the men opened fire with multiple guns, killing Mackey and injuring Flowers and Red. Defendant was arrested, and he subsequently gave a statement in December 2001 wherein he admitted to knowing "of" Red but not Mackey or Flowers. He also admitted to being present at the shooting, along with Chris, Cornelius, and Chris's "associate" Dan Smith. When asked why he was there, Defendant responded as follows:

A: With my brother, he said he wanted me and Cornelius to come with him and said we fixing to go take care of some business.
Q: What did your brother mean when he said we're fixing to go take [care of] some business?
A: I'm assuming he was talking about killing him or doing something to him.
Q: Why was your brother Chris wanting to kill Red?

---

[1] Although the indictment refers to Randall "White," the persons involved in this case referred to him as Randall "Moore." The parties stipulated that "the person alleged as Randall White in this indictment is the same person as Randall Moore, also known as Red." For convenience, we refer to him by his nickname, "Red."

[2] The felony murder charge was predicated on the attempted first degree murders.

[3] Although this Court generally refers to parties and witnesses by their last names, we have chosen to use a limited number of first names in this opinion because several persons share a last name and because Defendant refers repeatedly in his statement to Cornelius Jefferson as "Cornelius."

A: Because Chris said that Red tried to kill him. Chris said that someone called him on his cell phone and alerted him that Red was going to try and kill him.

When asked about weapons, Defendant stated that he "and Cornelius had the shotgun and my brother Chris had a SK assault rifle. Dan had the other two which was a .38 and .25 or .22 automatic." When asked about the source of these weapons, Defendant said that he did not know, but that when he arrived home from juvenile court, "Chris had the .38 on him and he had the SK outside of my mother's house in the back yard." When asked to describe the events surrounding the shooting, Defendant responded as follows:

I came home that day and came in the house and that's when my brother told me that he got into it with Red. He said that Red tried to kill him, then he pulled out the .38 and said "I got this for him, if he decides to come to the house looking for me.["] I went to sleep, woke up, helped my mom bring groceries in the house. Cornelius came over, we drunk and they smoked, whatever, sit in the backyard. I stepped in the house for a minute talking to my mom and my brother came in the house and told me to come here.

So I went back to the backyard, I seen SK laying [sic] on the ground. I asked him what was it for and he said protection. So I told him I was going back in the house for a minute to talk to my mom. Then after I got through talking to her, I left. I went to the backyard, my brother was gone. I asked Cornelius where he was, he said he was gone to the Raintree to meet Dan. After that me and Cornelius walked to the store, on the way we seen my brother and Dan in the shortcut with the guns. I asked him "what's up"; he asked me "what's up". He said he was about to take care of some business. I said I was going to the store, so as we walked to the store he talked to some females, they said they were walking up to Black Store so we walked to the Black Store.

We departed from them. Went back to my house, finished drinking, smoking or whatever. We wanted some more weed so we went and got my brother to get some weed from him. But instead of getting some weed from him, he didn't give us no weed. He was like he was fixing to go take some [sic] of some business. At that time he wanted us to go with him so we walked towards Randle's [sic] house. On the way we ran across three kids, I guess he thought one of the kids was Randle. So he walked up to him and asked who he was and the boy replied that he knew my brother then my brother pulled the S[K] up on him.

Then the boy ran behind me and I told my brother no. I don't know if he intended to shoot the boy or not but after I told him no, the boy ran. Chris continued to walk towards Randle's house. He and Dan walked to the door, knocked on the door and began to open fire. Chris ran and I assumed Dan ran in the house because I could hear a change in the shots fired. So I guess Dan realized he was by himself, so he ran.

Cornelius shot in the air as other shots were being fired. After that all of us ran together through the shortcut. Dan caught up with us and ran through the shortcut and then we went our separate ways. Me and Cornelius paid someone $10.00 to take us to a hotel on Third. We stayed there a couple of night and he left and went home. I stayed in the motel.

Defendant told the police that he and Cornelius were in the "alley" between the apartment buildings when the shooting began. He said that Chris and Dan began shooting when the apartment door was opened, and that Cornelius went into the court yard area and shot the shotgun. Defendant admitted that he shot the shotgun, as well, but stated that he shot it into the air. Dan took the shotgun as they were running away afterwards. He did not know where any of the guns were at the time he gave his statement.

When asked if Chris had threatened either Defendant or Cornelius in order to make them accompany him, Defendant responded, "He was aggressive with his words, he was like usually when he drunk and things don't go his way, and he gets upset." Defendant described the shooting as "just a split second thing. It was a heat of the moment type th[i]ng." He did not learn that anyone had been killed until later, when he spoke with Cornelius and learned that Chris was "locked up."

Codefendant Cornelius, also seventeen years old in April 2001, testified at trial. He explained that he and Defendant had been at Defendant's house before the shootings, "smoking [weed] and drinking . . . a little liquor." Chris came over with some "long rifles" and had Cornelius and Defendant "go with him" to some nearby apartments. Cornelius stated that Chris "made" him go along by pointing a rifle. A fourth man Cornelius did not know accompanied them. Once the four men reached the apartment, Chris told Cornelius to knock on the door. According to Cornelius, he and Chris were standing side by side at the door while Defendant and Smith were behind them. After Cornelius knocked, a black male answered the door. Cornelius saw two women inside the apartment. Chris knocked Cornelius out of the way and began shooting with his rifle. Cornelius ran away and heard the shooting continue as he ran.

-4-

Cornelius testified that he did not see Defendant with a gun but that Defendant told him a couple of days later that he had had a pistol at the scene. Cornelius also testified that Defendant told him that Defendant had entered the apartment and shot at a woman.

According to Cornelius's testimony and Defendant's statement, the four men encountered several youngsters on their way to the apartment where they expected to find Red. One of these young people, Timothy Jackson, testified at trial. He stated that Chris asked him twice where Red was and when Jackson twice replied that he did not know, Chris "held up a 12-gauge pump and put it to [Jackson's] side." According to Jackson, Defendant said to Chris, "Come on, man, let's go take care of this business." Jackson then ran away and hid under a car. A few minutes later, he heard several gunshots and explained that they were from more than one gun. He also testified that, during their encounter, he saw Defendant holding a handgun at his side.

Ashanti Pinkins, another member of the group encountered by Defendant and his cohorts, testified that Chris was holding a "rifle with a banana clip." According to Pinkins, Chris asked them if they knew where Red was because they wanted to buy some "weed." She said that Jackson responded, "No, Chris we didn't know where he was at." Chris then said, "What? How do you know my name?" and "put the gun to [Jackson's] side." Jackson pushed the gun away and ran off. Defendant started leaving and told Chris, "They're straight, come on Chris they straight." Chris followed, telling the group, "I know how y'all look so don't – if y'all snitch, I'm going to kill y'all."

After this encounter, the men continued on their way to the targeted apartment. Anitra Flowers, whose apartment it was, testified that Mackey (the murder victim) and Red, her boyfriend, were there along with Mackey's girlfriend and Flowers' children. When there was a knock on the door, Mackey and Red answered the door together. Flowers heard gunshots, so she got on the floor and headed toward the back of the apartment to check on her children. Flowers testified that the gunshots were coming from the back (kitchen) door and the front patio window. Flowers stated that she sustained three gunshot wounds to her right leg; Red sustained six gunshot wounds. Flowers called 911 when she reached the bedroom in which she found her children.

Aja Brown, fourteen years old at the time of the shootings, testified that she was then living in the same apartment complex as Flowers. At approximately 6:00 that evening, she saw Defendant and Chris at a store. She stated that, based on "the way they was acting and how they was dressed," the two men were "drunk." Later in the evening, she saw Chris and Defendant walking in the direction of Flowers' apartment. She later saw gunshots being fired in the living room of Flowers' apartment, and about twenty-five seconds after the shooting stopped, she saw three people running away.

Police responded to the scene at approximately 9:20 p.m. They found the murder victim lying on the floor. Officers recovered nineteen 7.62 x .39 shell casings at the scene; testimony established that such shells are "[p]rimarily used in something like an assault rifle, AK-47 and SkS-machine gun type of weapon." Officers also recovered four shotgun shells, two .22 shells, and bullet fragments at the scene.

The physician who conducted the autopsy of the murder victim testified that the cause of death was "multiple gunshot wounds." She identified fifteen gunshot entrance wounds and stated that "a lot" of the wounds were caused by high velocity bullets, but that at least one wound was caused by a small caliber bullet.

Defendant's sister, Sabrina Hatcher ("Sabrina"), who was eighteen years old at the time of trial, also testified. She stated that she spoke with Defendant over the phone on the night of the shooting. He called her, she said, because she "had asked him for some money that day and he told [her] after he got through taking care of some business he was going to give it to [her]." When the prosecution asked her about the kind of business he was going to take care of, she stated that she did not know.

The prosecution then referred her to the statement she had given to the police several hours after the shootings. She acknowledged the statement, that she was fifteen years old at the time she gave it, and stated that she told the truth when she gave the statement. She also acknowledged that her memory of the events was better at the time she spoke with the police than it was at trial. The prosecutor gave her the statement to read, directing her to a particular segment in which she reported that Defendant had told her over the phone that he and Chris were going to kill Red. She read to herself the portion to which she was directed and then stated, "I don't remember saying this." She added, "I didn't tell them this" and "this statement right here is not right." The trial court subsequently allowed the prosecution to admit Sabrina's statement as an exhibit to her testimony.

Sabrina also testified that Defendant was afraid of Chris and had started carrying a "small silver gun" for protection from his brother. She indicated that Chris was four years older than Defendant. She was also afraid of Chris and testified that he had attacked her in 2001, hitting her in the face with his fist. Defendant stopped the attack by pulling a gun on Chris.

According to Sabrina, Chris had attacked Defendant at their house in June 2000. She testified, "[Defendant] ran to [her] room and Chris threw him on the ground and started choking him and he had already had him on the ground just hitting him in the head." She stated that "[Chris] was hitting [Defendant] in the face with his fist" and that Chris bit "half of [Defendant's] thumb off." An ambulance was called and Defendant went to the hospital for treatment. Charges were filed with the police.

The defense called Defendant's mother, Brenda Brown, to testify. She explained that Chris was two years older than Defendant. Chris constantly bullied Defendant, and Brown stated that there were "many times" when she saw Chris "beating" Defendant. According to Brown, Defendant was afraid of Chris. When Defendant was about twelve, Chris was carrying a gun and threatening to kill Defendant. Brown testified that this made her "scared." At one point, Chris attacked Defendant in their family home. Chris "took something and hit [Defendant] and he bit [Defendant's] finger, almost bit his finger off." Brown was "scared" during this incident because she believed that Chris "had a gun in his pocket." When the police arrived, Chris ran off. An ambulance took Defendant to the hospital.

Brown also testified that, before the shootings took place, she "called the police to have [Defendant] go to Juvenile and have Juvenile hold him until [she] could get [Chris]" out of town. Chris did not leave, however, and, according to Brown, Juvenile could not hold Defendant any longer. On cross-examination, Brown admitted that Chris went with her to pick Defendant up from Juvenile Court on the day of the shootings.

**Procedural History**

The jury convicted Defendant of the first degree premeditated murder of Marcel Mackey, the alternative count of first degree felony murder, and the attempted first degree premeditated murders of Anitra Flowers and Randall White/Moore. The trial court's minute entry for January 28, 2005, reflects that, after the jury's verdicts were reached and announced, "the defendant, through his counsel of record, move[d] the court for a new trial, which [was] set to Thursday, March 17, 2005, for HEARING AND SENTENCING." On February 22, 2005, Defendant filed a pleading captioned "Motion for New Trial and Leave of Court to File Additional and Supplemental Grounds upon Completion of the Record." Four grounds for a new trial were asserted in this pleading: (1) insufficient evidence; (2) erroneously admitted photographs of the murder victim; (3) the refusal to admit certain medical records; and (4) error "in denying [Defendant's] request for special instructions regarding [his] state of mind at the time of his alleged participation in the crime."

The sentencing hearing began on May 18, 2005, and counsel argued primarily about (1) whether the presumptive minimum sentence for attempted first degree murder was fifteen or twenty years; (2) whether Defendant should receive more than the minimum sentence; and (3) whether the sentences should run consecutively or concurrently to one another. At the conclusion of argument, the trial court continued the proceedings for two weeks to allow for the preparation of a sentencing findings of fact and order. The court declined to impose sentence on any of the counts and held all matters until June 2.

The Court filed its "Sentencing Findings of Fact" on August 5, 2005; however, that same document is also signed by the judge after the declaration "IT IS SO ORDERED this 4 day of Oct., 2005."

The next hearing was conducted in October 2005, and the parties picked up their sentencing arguments where they had left off in May. At the beginning of the October hearing, the judge stated that he understood they were there to determine whether the sentences should be consecutive or concurrent. Counsel for Defendant then advised that he had filed a motion to withdraw based on communications from Defendant that Defendant was not satisfied with his representation. Defense counsel also noted that he had filed a motion for new trial and that he was ready to argue it. The judge then announced that he sentenced Defendant to serve his two attempted murder convictions concurrent to each other but consecutive to the first degree murder conviction. He did not announce the number of years that were to be served on each attempted first degree murder conviction. Defense counsel noted an exception to this sentencing ruling, and the judge said, "We can make that part of the motion for new trial." The judge then instructed defense counsel to argue the motion for new trial before he decided whether counsel should be replaced on appeal.

Defendant objected to having counsel present the motion for new trial, but the court directed counsel to proceed. The court noted at that time, however, that if a new lawyer were to be appointed, that lawyer could file an amended motion for new trial. The court further noted that he was allowing counsel to incorporate the sentencing issue into the motion for new trial. The judge also announced for the record his reasons for ordering consecutive sentencing. The court then allowed counsel to argue the four grounds asserted in the February 2005 motion for new trial.

After arguments were complete, the trial court reiterated that Defendant was to receive a life sentence on the murder charge, to be served consecutively to the two attempted first degree murder sentences. In response to a question, the court confirmed that no judgment sheets had yet been entered. The court then denied the motion for new trial on all four grounds, allowed defense counsel to withdraw, and appointed attorney Lance Chism to represent Defendant on appeal and "to file whatever other additional amendments to the motion for new trial that he would like to file." The judge then announced that he needed the judgment orders, and the Assistant District Attorney advised that he would provide them.

The transcript then contains the notation "(Later this same day)." After that notation, the court formally appointed Mr. Chism, who was apparently then present, to represent Defendant. The judge stated in part, "They filed a motion for new trial, I denied that and allowed them to amend it, if necessary. So you can determine then whether or not you want to file an amended motion for new trial. You're also appointed for the appeal." The judge then said, "[a]nd we're going to bring him back tomorrow for sentencing."

-8-

The transcript next contains a portion dated "Tuesday, October 4, 2005." During this proceeding, the court asked to see the sentencing order and then stated that it had made an error and that the defendant needed to be sentenced. The court observed, "We made the two criminal attempts, murder in the first degree will run consecutive, but I didn't really actually give you the time on those. So it will be your two fifteen year sentences running concurrent with each other, but consecutive to a life sentence." The court then formally repeated the correct sentence for each of the three convictions.

The technical record reflects that the trial court merged the two murder convictions and entered on October 4, 2005, a judgment reflecting the first degree murder conviction with a sentence of life imprisonment. On the same date, the trial court entered judgments of conviction on each of the two attempted first degree murder convictions, each carrying a sentence of fifteen years imprisonment, to be served concurrently with each other but consecutively to the murder sentence.

The technical record also contains an Order Overruling Motion for New Trial entered and filed October 3, 2005. On November 2, 2005, the defense filed a pleading titled "Motion Requesting Trial Court to Enter Order Permitting Counsel to File an Amended Motion for New Trial." The trial court granted the defense motion by written order filed November 2, 2005. No time frame for filing any amended motion was established. An "Amended Motion for New Trial" was subsequently filed, and although the stamped file date is too faint to discern, the certificate of service is dated May 2, 2006. A "Supplement to Amended Motion for New Trial" was filed on May 10, 2006. On July 31, 2006, a hearing was held on Defendant's amended motion for new trial, during which counsel argued five grounds, including (1) error in the jury charge on criminal responsibility; (2) error in admitting a recorded past recollection as an exhibit; (3) error in failing to instruct the jury on the defense of duress; (4) error in failing to charge the jury on voluntary intoxication; and (5) error in admitting proof of a prior bad act.[4] The trial court denied Defendant's amended motion from the bench, and an Amended Order Overruling Motion for New Trial was entered and filed July 31, 2006. A Notice of Appeal was filed August 30, 2006.

In its brief to the Court of Criminal Appeals, the defense raised six issues: (1) the trial court erred in its instructions to the jury on criminal responsibility; (2) the trial court erred by failing to charge duress; (3) the trial court erred when it allowed a prior recorded recollection to be admitted as an exhibit; (4) the trial court erred by failing to instruct the jury about voluntary intoxication; (5) the trial court erred by refusing to admit certain of Defendant's medical records; and (6) the trial court erred by admitting certain photographs

---

[4] Over defense objection, the trial court allowed Aja Brown to testify that she observed Defendant and Chris rob Red approximately two weeks before the shootings. This issue has not been raised in this Court.

of the deceased. The Court of Criminal Appeals refused, however, to consider issues raised after the original motion for new trial had been denied, and addressed only those issues raised in the original motion for new trial, holding that the subsequent attempts to amend the motion for new trial were untimely. The Court of Criminal Appeals affirmed Defendant's convictions and sentences. We granted Defendant's application for permission to appeal.

## ANALYSIS

### I. Defendant's Motion for New Trial
### and Attempted Amendments

The first issue we must address is the efficacy of Defendant's original motion for new trial and his subsequent attempts to amend that motion. Our resolution of this issue rests upon our interpretation of Tennessee Rule of Criminal Procedure 33. We review de novo issues involving the interpretation of our rules of criminal procedure. State v. Ferrante, 269 S.W.3d 908, 911 (Tenn. 2008).

Rule 33 provides in pertinent part that

[a] motion for a new trial shall be in writing or, if made orally in open court, be reduced to writing, *within thirty days of the date the order of sentence is entered*. The court shall liberally grant motions to amend the motion for new trial *until the day of the hearing on the motion for a new trial*.

Tenn. R. Crim. P. 33(b) (emphases added). Rule 33 clearly contemplates that the trial court will conduct the sentencing hearing and enter the uniform judgment order *before* any motion for new trial is filed. The defense then has thirty days from entry of the judgment order in which to file its motion for new trial. As this Court and the Court of Criminal Appeals have often repeated, this thirty-day period is jurisdictional and cannot be expanded. State v. Bough, 152 S.W.3d 453, 460 (Tenn. 2004); State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997); State v. Stephens, 264 S.W.3d 719, 728 (Tenn. Crim. App. 2007); see also Tenn. R. Crim. P. 45(b)(3) ("The court may not extend the time for taking any action under Rules of Criminal Procedure 29, 33 and 34, except to the extent and under the conditions stated in those rules."). Once a motion for new trial is timely filed, leave to amend should be liberally granted, and the trial court should not hold the hearing on the motion for new trial until the defense has had an adequate opportunity in which to file its amendments.

The procedural history of this case is rather more convoluted than is anticipated by Rule 33. We first note that the judgments of conviction and sentence were not entered until October 4, 2005. The thirty-day period for filing a motion for new trial did not actually commence to run until that date. In this case, however, defense counsel filed its original

written motion for new trial on February 22, 2005: prior to the date on which the thirty-day period even began to run. Moreover, the trial court *heard and ruled upon* the motion for new trial and entered its order overruling the motion for new trial on October 3, 2005*, before* sentencing was complete and *before* the judgments of conviction and sentence were entered. However, the prosecution lodged no objection to the timing of the hearing on the motion for new trial.

Our Court of Criminal Appeals has considered cases in which the defense filed prematurely its motion for new trial. For instance, in State v. Siliski, 238 S.W.3d 338 (Tenn. Crim. App. 2007), the defendant filed her motion for new trial on October 26, 2004, although judgment was not entered until December 21, 2004. Noting that the motion for new trial was therefore premature, the intermediate appellate court nevertheless considered the issues raised therein, emphasizing that (1) the State had not raised the issue on appeal, and (2) no prejudice accrued to the State from the court's consideration of the issues raised in the premature motion. Id. at 374 (citing State v. Lee, No. 01C01-9806-CC-00266, 1999 WL 346196, at *5 (Tenn. Crim. App. June 2, 1999)). Similarly, the State has not raised an issue about the premature filing of the defense's original motion for new trial in this case. Nor is any prejudice to the State apparent from consideration of the issues raised therein. For the purposes of this case, we hold that the original motion for new trial was filed timely.

The primary issue addressed by both parties before this Court, and decided adversely to Defendant by the Court of Criminal Appeals, is the efficacy of the "Motion Requesting Trial Court to Enter Order Permitting Counsel to File an Amended Motion for New Trial" ("Motion Requesting Permission") that the defense filed on November 2, 2005, and the subsequent "Amended Motion for New Trial" and "Supplement to Amended Motion for New Trial" that the defense filed in May 2006. To address this issue, we must review our decisions in Bough, 152 S.W.3d at 462, and State v. Butler, 626 S.W.2d 6, 12 (Tenn. 1981).

In Bough, we addressed a situation similar to that before us in this case. The defendant had been convicted of first degree (felony) murder and especially aggravated robbery. The verdict was announced on June 12, 2001, and, immediately thereafter, the trial court "imposed the mandatory life sentence and entered judgment on the felony murder conviction accordingly." Id. at 459. The trial court entered judgment on the robbery conviction on August 3, 2001, after a sentencing hearing. The defendant filed a motion for new trial as to both convictions on August 3, 2001. Id.

The trial court heard the motion for new trial on September 27, 2001, and orally denied the motion. Defense counsel then requested permission to withdraw. The trial court granted defense counsel's request and appointed new counsel. New counsel filed an amended motion for new trial on October 11, 2001, "which asked the trial court to direct that a transcript be prepared 'so that the newly appointed counsel . . . [could] properly preserve

all objections and errors for the appellate courts.'" Id. The trial court ordered transcripts prepared and a second amended motion for new trial was filed on March 6, 2002. After a hearing, the trial court denied the motion. The defense thereupon filed timely a notice of appeal. Id.

This Court first held that the thirty-day period for filing a motion for new trial as to both convictions began to run on August 3, 2001, the date on which the judgment was entered on the robbery conviction. Id. at 460-61. We held that, "where there is a single trial for felony murder and the underlying felony, and where the sentences are entered on different days, we interpret Rule 33(b) as to require a motion for new trial to be filed within thirty days of the day the last sentence is entered." Id. Applying this rule to the instant case, it appears that the deadline for Defendant to file his motion for new trial was thirty days after October 4, 2005. As set forth above, we have determined that, by filing his motion for new trial on February 22, 2005, Defendant met this deadline.

In Bough and Butler, we also addressed the timeliness of amendments to motions for new trial. Although Rule 33 states unequivocally that amendments to motions for new trial shall be allowed "liberally . . . *until* the day of the hearing on the motion for a new trial," Tenn. R. Crim. P. 33(b) (emphasis added), we held in Bough that "this rule does not prevent a judge from allowing, at his or her discretion, an amendment to a motion for new trial *at any time during which the trial judge has jurisdiction of the case*," 152 S.W.3d at 461 (citing Butler, 626 S.W.2d at 12) (emphasis added). Because the defendant in Bough filed his amended motion for new trial fourteen days after the initial motion for new trial was denied, and before a notice of appeal was filed, we held that the trial court retained jurisdiction of the case and had the discretion to hear and determine the amended motion for new trial. Id. at 462.[5]

In Butler, decided almost thirty years ago, the defendant filed his motion for new trial, and the trial court conducted the hearing. Before the trial court entered its order denying a new trial, the defendant filed a motion to amend his motion for new trial, "setting forth what purported to be newly discovered evidence." 626 S.W.2d at 12. The trial court afforded the defendant a hearing on his motion to amend, but refused to consider the motion on its merits. Instead, the trial court ruled that Rule 33 did not permit amendments to be made after the hearing on the motion for new trial had been held. This Court held that the trial court thereby erred because

---

[5] Had the defendant in Bough filed his amended motion for new trial more than thirty days after the trial court entered an order denying his original motion for new trial, the pleading would have been a nullity because the judgment would have become final. See Tenn. R. App. P. 4(c), (e); State v. Pendergrass, 937 S.W.2d 834, 837 (Tenn. 1996). Upon a judgment becoming final (or upon the timely filing of a notice of appeal), the trial court loses its jurisdiction of the case. State v. Green, 106 S.W.3d 646, 648-49 (Tenn. 2003).

the rule does not prevent a judge, in his discretion, allowing an amendment to a motion for a new trial at any time the trial judge has jurisdiction of the case. As pointed out in Rule 2 of the Tennessee Rules of Criminal Procedure, "the rules are intended to provide for the just determination of every criminal proceeding. They shall be construed to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay." The ground of the amendment to the motion for new trial was basic to the guilt or innocence of [the defendant], and its validity should have been considered by the trial judge at the earliest possible time.

Butler, 626 S.W.2d at 12.

In the instant case, the defense filed its Motion Requesting Permission on November 2, 2005, within thirty days of the trial court's written order overruling the defense's original motion for new trial. Under Bough and Butler, the trial court believed it still had jurisdiction to consider this pleading, and the trial court did, indeed, grant the Motion Requesting Permission. Moreover, the trial court later considered the subsequent Amended Motion for New Trial and Supplement to Amended Motion for New Trial, both of which were filed many months after the trial court entered its order denying the original motion for new trial.

On appeal, the Court of Criminal Appeals held that the Motion Requesting Permission did not fit within the parameters of Bough because it was not actually an amended motion for new trial. We agree.

In State v. Blunkall, 731 S.W.2d 72 (Tenn. Crim. App. 1987), judgment was entered on the defendant's armed robbery conviction on May 16, 1985. On May 29, 1985, the defendant filed a motion requesting "an Order directing that his counsel of record be given an extended period to file a Motion for a New Trial in this cause of thirty (30) days from the preparation and filing of the transcript." Id. at 73. The trial court granted the motion and the defense filed its motion for new trial on December 2, 1985. On appeal from the trial court's eventual denial of the motion for new trial, the Court of Criminal Appeals held that the motion for new trial was not timely because it was not filed within thirty days of judgment having been entered. Id. The intermediate appellate court determined that, contrary to the defendant's argument, the motion filed on May 29, 1985, did not serve as a motion for new trial. Id. at 74. Accordingly, the thirty-day period for filing a motion for new trial ran, and the judgment became final before a motion for new trial was filed. The intermediate appellate court noted that "[t]he motion for an extension of time shows on its face that it is not a motion for a new trial. No grounds of error are assigned in the motion for an extension of time nor is any relief prayed from the judgment of conviction." Id. The Court of Criminal Appeals stressed that "[i]t is not sufficient that the defendant file 'some document' as he

insists; he must file a motion for a new trial specifying grounds for relief." Id.; see also Fahey v. Eldridge, 46 S.W.3d 138, 143 (Tenn. 2001) (stating that a motion for new trial should set forth (1) "a concise statement of the factual grounds" on which error is being alleged, (2) "the legal ground upon which the trial court based its actions," and (3) "a concise statement asserting the legal reasons why the court's decision was improper"). Cf. Carter v. Bell, 279 S.W.3d 560, 563 (Tenn. 2009) (recognizing that pleadings are construed according to the relief sought). We adopt this reasoning.

In this case, the Motion Requesting Permission does not contain any factual or legal grounds in support of a new trial nor does it contain a prayer for relief from the judgments of conviction. Rather, similar to the pleading in Blunkall, it simply seeks permission to file at some later date an amended motion seeking a new trial. It is unclear why the defense filed this pleading, because the trial court had orally granted permission to file during the October 3rd proceedings. In any event, the Motion Requesting Permission did not serve as an amended motion for new trial. Thus, the actual amended motion for new trial – which was not filed until May 2006 – was a nullity.

Although we can decide this issue on this alternate ground, this case also provides us with an opportunity to reevaluate our decisions in Bough and Butler. Construed to their logical extreme, our decisions in Bough and Butler give trial courts the discretion to allow the defense to file *multiple* amendments to a motion for new trial *after* the trial court hears and denies an original motion for new trial. As long as the first of such motions to amend is made within thirty days of the date on which the order denying the motion for new trial was entered, the trial court would retain jurisdiction. It is conceivable under Bough and Butler that a defendant could continue this maneuver repeatedly and obtain even more than two orders denying a new trial because, until the defendant allows thirty days to pass after entry of the judgment order or the most recent order denying a new trial, the trial court retains jurisdiction. Tennessee Rule of Criminal Procedure 33 does not contemplate sequential hearings on motions for new trial after the original hearing has been held and an order denying the motion entered.

The circumstances of the instant case, in which a second order denying a new trial was not entered until approximately eighteen months after the jury pronounced its verdict, illustrate the potential problems with delay that can occur when a trial court allows amendments to be made long after the initial motion for new trial hearing is held and an order denying the motion entered. Rather than eliminating unjustifiable delay, one of the bases for our decision in Butler, the instant case created it. As noted by the Court of Criminal Appeals in Blunkall,

> The time fixed by law for the filing of a motion for a new trial has a
> valid purpose. If the rule were not a rigid one, appeals could be delayed . . .

-14-

for many months or for years. Justice requires that appeals in criminal cases not be unduly delayed. Guilty defendants on appeal bonds should be taken off the streets and innocent defendants not on bond should be released.

731 S.W.2d at 74. Upon further reflection, we are constrained to hold that a stricter interpretation of Rule 33 is necessary to prevent parties from taking, albeit with judicial permission, undue advantage of our decisions in Bough and Butler and thereby creating, as in this case, unjustifiable delay in the judicial process. Accordingly, we hold that amendments to timely filed motions for new trial may be had "*until* the day of the hearing on the motion for a new trial," Tenn. R. Crim. P. 33(b) (emphasis added), but not after the trial court has entered an order denying a new trial.

This stricter interpretation aligns with the Advisory Commission Comments to Rule 33(b), which provide as follows:

> [s]ome attorneys seek to "reserve the right to amend" a motion for a new trial, and subsequently file such amendments without a court order permitting it. Clearly the philosophy of the rule is to permit *timely* amendments, and for that reason the rule does not close that time frame *until the motion is heard*. However, the fact that the trial judge "shall allow amendments liberally" does not mean that the judge shall allow all such amendments, and counsel must not make a regular practice of filing only a skeletal motion with the intention of bringing all of their substantive grounds in an amendment *carried to the hearing*. The trial judge retains the power the deny amendments, and strong consideration should be given to whether the new ground being raised was *promptly* brought to the court's attention.

Tenn. R. Crim. P. 33 advisory comm'n cmts. (emphases added). The Comments interpret Rule 33(b) as providing a time frame for filing amendments "until the motion is heard," and interpret the mandate that trial judges grant motions to amend "liberally" as applying to amendments "carried to the hearing."

Accordingly, trial courts should not hold any hearing on a motion for new trial until a reasonable time after the sentencing hearing has been held, sentence has been imposed, and the judgment order entered. If the defense files a timely motion for new trial, the trial court should provide the defense with ample opportunity to amend the motion prior to holding the new trial hearing. If new counsel is sought and obtained, additional time for amendments to the motion for new trial may be granted as necessary. Once the hearing on the motion for

new trial is heard and an order denying a new trial has been entered, however, motions to make additional amendments must be denied.[6]

In sum, we hold that, on alternative bases, the Court of Criminal Appeals was correct in refusing to consider the grounds raised in the "Amended Motion for New Trial" and the "Supplement to Amended Motion for New Trial," both of which were filed after the hearing and decision on the original motion for new trial.

As a result of our holding, it becomes clear that the defense had thirty days after the trial court entered its original order denying the motion for new trial in which to file its notice of appeal. See Tenn. R. App. P. 4(c) (providing that the thirty-day period for filing a notice of appeal in criminal actions "shall run from entry of the order denying a new trial"). The notice of appeal in this case was not filed until August 30, 2006, clearly outside the thirty-day time frame.

The Court of Criminal Appeals nevertheless heard Defendant's appeal. The intermediate appellate court did not thereby err, as "in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." Tenn. R. App. P. 4(a). We agree that, given the trial court's rulings in this case and our holdings in Bough and Butler, the interest of justice is served by waiver of the untimely filing of Defendant's notice of appeal. Accordingly, we turn to Defendant's remaining issues.

## II. Issues Preserved by February 2005 Motion for New Trial

As recognized by the Court of Criminal Appeals, the only issues properly preserved are those raised in the motion for new trial filed on February 22, 2005. As set forth above, those issues are (1) the sufficiency of the evidence; (2) whether the trial court erred in admitting certain photographs of the murder victim; (3) whether the trial court erred in refusing to admit medical records reflecting injuries that Chris inflicted on Defendant during a confrontation; and (4) whether the trial court erred in denying Defendant's special request for a jury instruction regarding his capacity to form the mental state required by the charged offenses. The Court of Criminal Appeals held that Defendant is not entitled to relief on any of these issues.

Before this Court, Defendant does not complain about the judgment of the Court of Criminal Appeals with respect to any of these issues. Our review of the intermediate

---

[6] We take this opportunity to emphasize that trial courts should enter promptly into the record a written order reflecting the denial (or grant) of a defendant's motion for new trial. See State v. Byington, 284 S.W.3d 220, 225 (Tenn. 2005).

-16-

appellate court's analysis of the fourth issue concerning the trial court's jury instructions reveals some confusion, however. Accordingly, we have chosen to address that issue on its merits. See State v. Davidson, 121 S.W.3d 600, 618 n.11 (Tenn. 2003) (electing to address issue that was waived); State v. McKinney, 74 S.W.3d 291, 303 n.5 (Tenn. 2002) (same).

*Jury Instruction on "Diminished Capacity"*

During closing argument, defense counsel argued that Defendant participated in the shooting out of fear of his brother Chris and, as a result, did not have the intent or state of mind to commit premeditated murder.[7]  In conjunction with this defense theory, defense counsel requested in writing the following special jury instruction:

> In this case you have heard that the defendant acted because of fear of his brother, Christopher Hatcher, which could have affected his capacity to form the culpable mental state required to commit a particular offense.
>
> If you find from the evidence that the defendant's capacity to form a culpable mental state may have been affected, then you must determine beyond a reasonable doubt what the mental state of the defendant was at the time of the commission of the offense to determine of which, if any, offense he is guilty.  (T.P.I. CRIM. 42.22; Evidence of Mental State); State v. Hall, 958 S.W.2d 679 ([Tenn.] 1997); State v. Perry, 13 S.W.3d 724 ([Tenn. Crim. App.] 1999); State v. Phipps, 883 S.W.2d 138 ([Tenn. Crim. App.] 1994). Moreover, if you find that the defendant's mental state did not rise to a justification for his participation of [sic] the crime, you may find the defendant guilty of a lesser-included offense because the defendant was incapable of forming the requisite intent of the crime charge[d].  (State v. Hall, 958 S.W.2d 679 ([Tenn.] 1997)).
>
> In other words, no person may be convicted of an offense unless the culpable mental state is proven beyond a reasonable doubt. (State v. Hall, 958 S.W.2d 679 ([Tenn.] 1997)).

During trial, defense counsel argued to the court that this instruction was necessary to inform the jury that it could convict Defendant of a lesser degree of murder on its finding that Defendant's fear of his brother was such that he could not form the culpable mental state required for first degree murder. Defense counsel relied on the legal concept of "diminished capacity" in making this argument to the trial court. The trial court refused to deliver the

---

[7] Premeditated murder is the "premeditated and intentional killing of another."  Tenn. Code Ann. § 39-13-202(a)(1).

requested instruction, and the defense alleged in its original motion for new trial that the trial court thereby erred. The defense also alleged in its original motion for new trial that the trial court's jury instruction

> in regards to the necessary intent to constitute Murder in the First Degree was inadequate in that it did not balance such instruction with language to the effect that facts and circumstances could allow the jury to consider such proof to reducing the charge to Murder in the Second Degree.

The Court of Criminal Appeals analyzed this issue as though the defense had requested, and been refused, an instruction on the defense of duress, which is a distinct issue.[8]

Defendant's special request for jury instruction and his contention that the trial court committed reversible error in refusing to give it arise from the principle that "a defendant's capacity to form the requisite mental state to commit an offense is an issue in criminal prosecutions because the general criminal law in Tennessee provides that '[n]o person may be convicted of an offense unless . . . [t]he culpable mental state required[' ']is proven beyond a reasonable doubt.'" State v. Hall, 958 S.W.2d 679, 689 (Tenn. 1997) (quoting Tenn. Code Ann. § 39-11-201(a)(2) (1991)). Moreover, "the negation of an element of a criminal offense is recognized as a defense in Tennessee." Id.

In Hall, one of the cases the defense relied upon in making its special request, we considered whether expert testimony was admissible to demonstrate that the accused "lack[ed] the capacity, *because of mental disease or defect*, to form the requisite culpable mental state to commit the offense charged." Id. (emphasis added). We held that, so long as general relevancy standards and evidentiary rules were satisfied, such expert testimony was admissible. Id. Significantly to this case, however, we emphasized in Hall that the proof

> must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, *not just a particular emotional state or mental condition*. It is the showing of lack of *capacity* to form the requisite culpable mental intent that is central to evaluating the admissibility of expert psychiatric testimony on the issue.

Id. at 690 (initial emphasis added) (citing State v. Shelton, 854 S.W.2d 116, 122 (Tenn. Crim. App. 1992)). See also State v. Ferrell, 277 S.W.3d 372, 377-80 (Tenn. 2009); State v. Faulkner, 154 S.W.3d 48, 56-57 (Tenn. 2005).

---

[8] As is discussed more thoroughly later in this opinion, defense counsel did not ask for a duress instruction during the trial, or raise the lack of a duress instruction in the original motion for new trial.

In light of this issue, a pattern jury instruction was developed which addresses a defendant's capacity to have formed the culpable mental state required for conviction of the offense(s) charged. This pattern instruction provides, in pertinent part, as follows:

> The state must prove beyond a reasonable doubt the culpable mental state of the accused. Culpable mental state means the state of mind of the accused at the time of the offense. This means that you must consider all of the evidence to determine the state of mind of the accused at the time of the commission of the offense. The state of mind which the state must prove is contained in the elements of the offense(s) as outlined in these instructions *[above] [below]*.

> In this case, you have heard evidence that the defendant might have suffered from a mental *[disease] [defect]* which could have affected *[his]* *[her]* capacity to form the culpable mental state required to commit a particular offense. . . .

> If you find from the evidence that the defendant's capacity to form a culpable mental state may have been affected, then you must determine beyond a reasonable doubt what the mental state of the defendant was at the time of the commission of the offense to determine of which, if any, offense *[he]* *[she]* is guilty.

T.P.I.– Crim. 42.22 (2009) (footnotes omitted).[9] This pattern instruction makes clear that its use is contemplated when there has been proof that, at the time the defendant allegedly committed the crime, he or she was suffering from some mental *disease or defect* which affected his or her *capacity* to form the requisite mental state. Defendant has cited us to no authority, however, for the proposition that simple *fear* is a sufficient mental disease or defect to require this jury instruction. Nor have we found any such authority. Cf. Commonwealth v. Singley, 868 A.2d 403, 412 n.10 (Pa. 2005) (recognizing that theory of diminished capacity contemplates introduction of expert testimony addressing defendant's mental disorder affecting the cognitive functions necessary to formulate a specific intent such as deliberation and premeditation); State v. Trombley, 807 A.2d 400, 406 (Vt. 2002) (holding that the trial court was correct in refusing to instruct jury to consider defendant's state of mind in light of his "fear and emotions").

_____

[9] As we have previously observed, "pattern jury instructions are only suggestions for a trial court because they are 'not officially approved by this Court or by the General Assembly and should be used only after careful analysis.'" State v. Rimmer, 250 S.W.3d 12, 30 (Tenn. 2008) (quoting State v. Hodges, 944 S.W.2d 346, 354 (Tenn. 1997)).

The defense theory in Defendant's case was that he was so frightened of his brother Chris that he participated in the shootings with less than the culpable mental state required for premeditated murder or attempted premeditated murder. That is, the defense argued that Defendant's fear of Chris prevented him from acting intentionally and with premeditation while he participated in the shooting. The defense elicited no expert proof in support of this proposition. Moreover, this theory rests on "a particular emotional state or mental condition" rather than on Defendant's "lack of *capacity* to form the requisite culpable mental intent." Hall, 958 S.W.2d at 690. We hold that a defendant's fear of another person, such that he or she fears reprisal for refusing to commit a crime at the direction of the person feared, is not the type of mental disease or defect contemplated by a theory of defense that relies on negating the mens rea of the offense charged, sometimes referred to as the "diminished capacity" theory of defense.[10] Accordingly, the trial court did not err in refusing to give the special "diminished capacity" instruction requested by the defense in this case. Defendant is not entitled to relief on this issue.

### III. Issues Reviewed for Plain Error

*A. Standard of Review*

Our rules of appellate procedure provide that

> in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

Tenn. R. App. P. 3(e). Accordingly, the effect of our holding today is that the defense has waived those issues raised in this Court that were not included in the original motion for new trial. See State v. Banks, 271 S.W.3d 90, 119 (Tenn. 2008).

Nevertheless, when "necessary to do substantial justice," this Court has the authority to "consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."

---

[10] As we explained in Hall, "such evidence should not be proffered as proof of 'diminished capacity.' Instead, such evidence should be presented to the trial court as relevant to negate the existence of the culpable mental state required to establish the criminal offense for which the defendant is being tried." 958 S.W.2d at 690.

Tenn. R. App. P. 36(b). We refer to this discretionary consideration of waived issues as "plain error" review. See Grindstaff v. State, 297 S.W.3d 208, 219 n.12 (Tenn. 2009).

This Court will not grant relief under plain error review unless five criteria are met: (1) the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal rule of law; (3) the error adversely affected a substantial right of the complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake; that is, the error was so significant that it "'probably changed the outcome of the trial.'" State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994)). If any of these five criteria are not met, we will not grant relief, and complete consideration of all five factors is not necessary when it is clear from the record that at least one of the factors cannot be established. Id. at 283. The party claiming plain error has the burden of persuading the appellate court. Banks, 271 S.W.3d at 119.

We turn now to those issues raised by Defendant that were not included in his original motion for new trial and were thereby waived.

### B. Admission of Sabrina Hatcher's Statement

During its direct examination of Sabrina, and after she denied making a particular declaration, the prosecution questioned her about the statement she had given to the police during their investigation and which had been reduced to writing. The prosecution proffered the written statement to Sabrina so that she could refresh her recollection of it. Although she reviewed the statement and authenticated it, she resisted the prosecution's attempt to have her testify consistently with portions of her statement. The following exchange between the prosecution and Sabrina occurred:

Q: And you told the police[,] "I was at Chris's girlfriend's house and I called [Defendant] at my house and he told me that [he] had heard that Red was going to kill him and Chris." Did you tell them that?
A: Yeah, but – you know, I really don't remember[.]
Q: But, that's what you told the police; right?
A: (No audible reply).
Q: I know it's hard, Ms. Hatcher, but you have to tell the truth[.]
A: Y'all might have got that down wrong, because I couldn't have called him, because I didn't know he was out of Juvenile that day. He had just got out and my big brother was waiting on him to get out.
Q: But, this is the statement that you gave and this is the statement that you signed; didn't you?
A: Right, but it's not true, though.

Q: You're saying it's not true when you say that [Defendant] told you that he had heard that Red was going to kill him and Chris. You're saying that's not true?
A: Well I heard that.
. . .
Q: Okay. So you knew that Chris and [Defendant] were upset with Red, because there were threats out that Red was going to kill him; right?
A: Right.
Q: And you told the police, so that's when you said, "We funna [sic] go kill him" – maybe "We fixin' to go kill him[."] Didn't you tell the police that?
A: I don't think so.
. . .
Q: You're telling the Court that you did tell the police that [Defendant] had said he was going to take care of some business?
A: Right.
Q: But the statement says, the statement that you gave the police that night says that, "We fixin['] to go kill him." You don't remember that; right?
A: No.

Eventually, over the defense's objection, the trial court permitted the State to admit a copy of the statement as an exhibit, i.e., as substantive evidence. Significantly, the statement contains the following exchange:

Q: When was the last time you saw or spoke to Chris or [Defendant] before you found out a shooting had occurred?
A: I talked to [Defendant] on the telephone. I was at Chris' girlfriend[']s house and I called [Defendant] at my house and he told me that he heard that "Red" was going to kill him and Chris. So that's when he said "We funna [sic] go kill him."

Defendant contends that the trial court's admission of this statement as substantive evidence constitutes reversible error. The State concedes in its brief to this Court that the prosecution "should not have been allowed to introduce the actual statement as an exhibit."

We agree with the State. The prosecution wanted the jury to have access to Sabrina's statement to the police because it was unable to elicit testimony from her that was consistent with a significant segment of it. This Court has made clear, however, that prior inconsistent statements are not admissible as substantive evidence. Smith, 24 S.W.3d at 279. That the prosecution argued the statement's admissibility as a prior recorded recollection does not ameliorate the trial court's error. Tennessee Rule of Evidence 803(5) provides as follows:

Recorded Recollection. A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence *but may not itself be received as an exhibit unless offered by an adverse party*.

Tenn. R. Evid. 803(5) (emphasis added). Thus, even if Sabrina's statement qualified as a recorded recollection, the trial court erred when it allowed Sabrina's statement to the police to be admitted as an exhibit to her testimony and reviewed by the jury during its deliberations. The prosecution compounded the trial court's error by referring repeatedly to the admitted statement during its closing arguments.

We hold, however, that Defendant is not entitled to plain error relief on the basis of this erroneous admission of evidence because it does not appear to have affected the outcome of the trial. First, Sabrina repeatedly denied having told the police that Defendant told her about the group's intention to commit a killing. The jury therefore had proof before it that the transcriber of Sabrina's statement may have made a mistake about what she said. Second, the remaining proof against Defendant is overwhelming. He admitted to the police that he knew Chris was intending to kill Red. He also admitted to the police that he was at the scene of the crime, that he was armed, and that he shot one of the guns the group possessed. Jackson testified that he had seen Defendant holding a handgun shortly before the shootings and that Defendant had kept Chris focused on the task of "taking care of business." Cornelius testified that Defendant told him after the shooting that Defendant had entered the apartment and shot at one of the women inside. One of the gunshot wounds to the murder victim was from a small caliber bullet.

Given the substantial amount of proof that reflected Defendant's intentional and premeditated actions in participating in the shooting, the erroneous admission of Sabrina's statement was merely cumulative. Accordingly, we hold that substantial justice does not require us to set aside Defendant's convictions on the basis of the trial court's erroneous admission of Sabrina's statement. Defendant is not entitled to relief on this issue.

*C. Jury Instruction on Criminal Responsibility*

Defendant also complains about the trial court's jury instructions on criminal responsibility, arguing that the trial court erroneously charged the jury that it could find

Defendant guilty on two bases not supported by the proof.[11] The State concedes that the evidence did not support the challenged instructions on criminal responsibility, but argues that Defendant is nevertheless not entitled to relief.

Our criminal code provides that an accused may be found guilty of an offense committed by another person under the following circumstances:

> (1) Acting with the culpability required for the offense, the [accused] causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense;

> (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the [accused] solicits, directs, aids, or attempts to aid another person to commit the offense; or

> (3) Having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the [accused] fails to make a reasonable effort to prevent commission of the offense.

Tenn. Code Ann. § 39-11-402 (1997). As this Court has previously observed, "[t]he justification for this theory of criminal liability is that, in addition to the primary criminal actor, aiders and abettors should be held accountable for the criminal harms they intentionally facilitated or helped set in motion." State v. Sherman, 266 S.W.3d 395, 408 (Tenn. 2008). The prosecution may seek criminal liability under a theory of criminal responsibility by proving that the defendant "'knowingly, voluntarily and with common intent unite[d] with the principal offender[] in the commission of the crime.'" Id. (quoting State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)). Moreover, "defendants convicted under a theory of criminal responsibility are considered to be principal offenders, just as if they had

---

[11] The defense requested in writing that the jury be instructed as follows:

> In order for a defendant to be criminally responsible for the acts of another, a defendant must in some way associate himself with the venture, act with knowledge, that an offense is to be committed and share in the intent of the principle in the first degree.

> In other words, the defendant must knowingly, voluntarily and with common intent unite with principal in the commission of the crime.

The trial court denied this special request. The defense has not claimed in its brief to this Court that the trial court thereby erred.

committed the crime themselves." Id. (citing State v. Carson, 950 S.W.2d 951, 954 (Tenn. 1997)).

The defense points out that, while only the second set of circumstances described in the criminal responsibility statute was arguably applicable to Defendant, the trial court instructed the jury on all three, thereby confusing and misleading the jury and causing him undue prejudice. The trial court orally instructed the jury as follows:

> The defendant, ladies and gentlemen, is criminally responsible as a party to the offenses charged and included in these indictments, if the offenses were committed by the defendant's own conduct, by the conduct of another, for which the defendant is criminally responsible, or by both.

> Each party to the offense may be charged with the commission of the offense. The defendant is criminally responsible for an offense committed by the conduct of another if acting with the culpability required for the offense, *the defendant causes, or aids an innocent, or irresponsible person to engage in conduct prohibited by the definition of the offense.*

> The defendant is criminally responsible for an offense committed by the conduct of another if acting with the intent to promote or assist in the commission of the offense, or to benefit of [sic] the proceeds or results of the offense[,] the defendant solicits, directs, aids, or attempts to aid another person to commit the offense.

> The defendant is criminally responsible for an offense committed by the conduct of another, if *having a duty imposed by law, or voluntarily undertaken to prevent commission of the offense* and actual intent to benefit in the proceeds, or results of the offense, or to promote or assist its commission *the defendant fails to make a reasonable effort to prevent commission of the offense.*

> . . .

> Before you find the defendant guilty of being criminally responsible for said offenses committed by the conduct of another, you must find that all of the essential elements of said offenses have been proven by the state beyond a reasonable doubt.

(Emphases added). The defense argues that, since there was no proof that Defendant caused or aided an innocent or irresponsible person to commit the crimes of which he stands

convicted, this portion of the instruction did not assist the jury in determining any relevant issue but rather served only to confuse the jury. Defendant also argues that "[t]he proof in the present case did not support a finding that Defendant had a legal duty to prevent any of the other criminal actors from committing [these] offense[s]" and that this portion of the instruction "would have misled the jury into believing that it could convict Defendant for his failure to prevent this crime from occurring." Defendant argues that this instruction "greatly prejudiced" his case and requires reversal.[12]

The State responds that the trial court's instructions on subsections (1) and (3) of the criminal responsibility statute "amounted to nothing more than surplusage and did not prejudice" Defendant. The State also argues that plain error review is not warranted because, "[b]ased on the overwhelming proof of the defendant's guilt, any error on the part of the trial court in instructing the jury on the inapplicable subsections of the criminal responsibility statute was not 'so significant that it probably changed the outcome of the trial.'" We agree that Defendant is not entitled to relief on the basis of the trial court's jury charge on criminal responsibility.

This Court long ago made clear that "[o]ne of the most important functions of the Trial Judge is to select the rules of law which apply to the evidence given in the case on trial." Adcock v. State, 236 S.W.2d 88, 89 (Tenn. 1949). And we have admonished that a trial court's jury charge "'should not contain inaccurate or inapplicable statements of legal principles that might tend to confuse the jury.'" Troup v. Fischer Steel Corp., 236 S.W.3d 143, 149 (Tenn. 2007) (quoting Ingram v. Earthman, 993 S.W.2d 611, 636 (Tenn. Ct. App. 1998)).

Subsection (1) of the criminal responsibility statute is called into play when the conduct prohibited by the offense is actually committed by "an innocent or irresponsible person." Tenn. Code Ann. § 39-11-402(1). The proof in this case did not implicate any such person. Accordingly, the trial court should not have instructed the jury on this theory of criminal responsibility. See Griffin v. United States, 502 U.S. 46, 60 (1991) (recognizing that, "if the evidence is insufficient to support an alternative legal theory of liability, it would generally be preferable for the court to give an instruction removing that theory from the jury's consideration"); State v. Smith, 656 S.W.2d 882, 888-89 (Tenn. Crim. App. 1983) (holding that the trial court did not err by refusing to give an instruction not supported by the proof because such an instruction "would have done nothing more than confuse the jury").

---

[12] Although the defense submitted in writing and argued for an instruction on criminal responsibility based on subsection (2) of the criminal responsibility statute, the record reflects no specific objection to the instructions on subsections (1) and (3) of the criminal responsibility statute that were actually delivered.

Similarly, subsection (3) of the criminal responsibility statute is, by its own terms, implicated only when the accused is under a legal duty to prevent the offense, or voluntarily undertakes to prevent it. See State v. Rathbone, No. E2007-00602-CCA-R3-CD, 2008 WL 1744581, at *8 (Tenn. Crim. App. Apr. 16, 2008), perm. appeal denied (Tenn. Oct. 27, 2008) (recognizing that a defendant may be held criminally responsible under subsection (3) "where a person who has a legal duty to prevent the crime fails to do so with the specific intent to further the crime"); see also State v. Winders, No. 88-142-III, 1989 WL 105710, at *2 (Tenn. Crim. App. Sept. 14, 1989) (recognizing that, "for criminal liability to attach, it must be found that there was a legal duty to act and not simply a moral duty"). For instance, a child's parent or legal guardian may be under a legal duty to prevent an offense from being committed against the child. See, e.g., State v. Hodges, 7 S.W.3d 609, 623 (Tenn. Crim. App. 1998); State v. Gordon, No. 01C01-9605-CR-00213, 1997 WL 578961, at *6 (Tenn. Crim. App. Sept. 8, 1989). Defendant was under no such legal duty to prevent the crimes in this case,[13] and there is no proof in the record that he voluntarily undertook to prevent the shootings at the apartment. Accordingly, the trial court erred in giving the jury this instruction. Gordon, 1997 WL 578961, at *6.

The prosecution compounded the trial court's error when it referred to the third theory of criminal responsibility during closing argument. The prosecution argued as follows:

> Criminal responsibility is, the defendant is criminally responsible for the offense committed by the conduct of another if *having a duty imposed by law, or voluntarily undertaken to prevent the commission of the offense* and acted with intent to benefit in the proceeds, or the result of the offense, or to promote or assist in the commission, *the defendant failed to make a reasonable effort to prevent commission of the offense*.

> Did [Defendant] ever try to do anything to try to stop this from happening? Did he go into the house that night and say, "Mom, Chris is talking about killing this guy over in the Raintree Apartments, do something"[?]

> Did he ever go into the house and call the police himself? When he got to the apartment complex did he tell those teenage boys, "We're fixin to go kill Red, go call the police"[?]

---

[13] Indeed, the trial court issued no instruction as to what might constitute the "duty imposed by law" to which its charge referred.

When his brother went to the other side of the apartment and he was on the back side, did he ever do anything to stop this from happening? No, he didn't.

Instead what did he do, he started firing into that apartment like everybody else.

There are several more that goes along with criminal responsibility. You'll hear a long definition by the Court as to what criminal responsibility is.

(Emphases added). The prosecution should not have made this argument because it implied that Defendant had a duty to prevent the shooting, although the record contains not a shred of evidence reflecting such a duty. See State v. Thomas, 158 S.W.3d 361, 413 (Tenn. 2005) ("[C]losing argument must be temperate, must be predicated on evidence introduced during the trial of the case and must be pertinent to the issues being tried."); see also State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (recognizing that it is unprofessional conduct for a prosecutor to intentionally misstate the evidence or mislead the jury about the inferences it may draw) (quoting ABA Project on Standards for Criminal Justice, Standards Relating To The Prosecution Function And The Defense Function §§ 5.8-5.9 cmt. (approved draft 1971)); State v. Houston, 688 S.W.2d 838, 841 (Tenn. Crim. App. 1984) ("It is the province of the trial judge to state to the jury the law of the case, and it is not advisable for counsel to attempt to do so in final argument because of the possibility of error in their summation."); State v. Benson, 645 S.W.2d 423, 425 (Tenn. Crim. App. 1983) (recognizing that "'[i]t is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one'" (quoting Berger v. United States, 295 U.S. 78, 88 (1935))). The defense did not object, however, and our rules of appellate procedure provide that we need not grant relief "to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). See also, e.g., Thomas, 158 S.W.3d at 413 (holding that, where the defense failed to object to the prosecution's remarks during closing argument, the defendant was entitled to relief only if the remarks constituted plain error).

Moreover, we are unable to conclude that substantial justice requires us to grant plain error relief on this issue. In this case, the proof demonstrated that Defendant accompanied his brother and two other men to an apartment with the intention of confronting Red. Defendant admitted his assumption that Chris intended to kill Red. The group of men was carrying four guns between them, and Defendant admitted to having carried and shot a shotgun. When the men were briefly diverted from their goal by a group of youngsters they met en route, Defendant brought them back to task, telling Chris, "Come on, man, let's go take care of this business." Jackson testified that he saw Defendant holding a handgun

shortly before the shooting, and Cornelius testified that Defendant told him afterwards that Defendant had entered the apartment and shot at a woman during the confrontation. The autopsy of the murder victim revealed that he had been shot at least once with a small caliber bullet. In short, the proof is overwhelming that Defendant was a willing and active participant in the attack upon the apartment. The error in the jury instructions and the prosecution's error during closing argument were not so prejudicial that they probably changed the outcome of the trial. Defendant has failed to establish that he is entitled to plain error relief on this issue.

### D. Jury Instruction on Voluntary Intoxication

Related to the issue of the trial court's failure to instruct the jury on "diminished capacity," the defense complains about the trial court's failure to instruct the jury about voluntary intoxication.[14] As provided by our criminal code, "[voluntary] intoxication itself is not a defense to prosecution for an offense. However, intoxication, whether voluntary or involuntary, is admissible in evidence if it is relevant to negate a culpable mental state." Tenn. Code Ann. § 39-11-503(a) (1997); see also Wiley v. State, 183 S.W.3d 317, 333 (Tenn. 2006). Proof of voluntary intoxication is therefore akin to proof of a mental disease or defect that prevents a defendant from forming the culpable mental state required for the offense under consideration. Tennessee's pattern jury instruction on intoxication includes the following:

> Intoxication, whether voluntary or involuntary, is relevant to the issue of the essential element of the defendant's culpable mental state.
>
> In this case, the state must prove beyond a reasonable doubt the required culpable mental state of the defendant which is [insert definition of specific mental state required for charged and included offenses].
>
> If you find that the defendant was intoxicated to the extent that *[he] [she]* could not have possessed the required culpable mental state, then *[he] [she]* cannot be guilty of the offense charged.

T.P.I.–Crim. 40.02 (2009) (footnotes omitted).

Of course,

---

[14] Defense counsel did not request a jury instruction on voluntary intoxication and did not argue this theory of defense to the jury.

[t]he general principle in criminal cases is that there is a duty upon the trial judge to give a complete charge of the law applicable to the facts of the case and the defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge.

State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975) (citing Poe v. State, 370 S.W.2d 488 (Tenn. 1963)).  See also State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000).[15]  However,

[p]roof of intoxication alone is not a defense to a charge of committing a specific intent crime nor does it entitle an accused to jury instructions . . . ; there must be evidence that the intoxication deprived the accused of the mental capacity to form specific intent.[16] . . . The determinative question is not whether the accused was intoxicated, but what was his mental capacity.

Harrell v. State, 593 S.W.2d 664, 672 (Tenn. Crim. App. 1979) (footnote added) (citing Lester v. State, 370 S.W.2d 405 (Tenn. 1963); Thomas v. State, 301 S.W.2d 358 (Tenn. 1957); Walden v. State, 156 S.W.2d 385 (Tenn. 1941); Simpson v. State, 437 S.W.2d 538 (Tenn. Crim. App. 1968)).

The only proof in the instant case concerning Defendant's intoxication came from Cornelius, Aja Brown, and Defendant's statement to the police.  Cornelius testified that, on the afternoon of the crimes, he and Defendant smoked "weed" and drank "a little liquor." Aja Brown was of the opinion that Defendant appeared "drunk" when she saw him at the store that evening several hours before the shootings.  Defendant told the police that he and Cornelius had consumed liquor that afternoon and also intimated that he had smoked some "weed."

None of this evidence demonstrated that Defendant's alleged intoxication was such that, hours later, it deprived him of the mental capacity to form the culpable mental state

---

[15] Where a trial court gives an allegedly incomplete jury charge to which the defense does not object, we consider the issue waived and will review the omitted instruction for plain error only.  State v. Bledsoe, 226 S.W.3d 349, 353 (Tenn. 2007).

[16] Since Harrell, this Court has recognized that our legislature has "abandoned the 'confusing distinction between general and specific intent.'"  State v. Mann, 959 S.W.2d 503, 522 (Tenn. 1997) (quoting Tenn. Code Ann. § 39-11-301 sentencing comm'n cmts. (1991)).  Thus, the current statute regarding proof of intoxication for defense purposes refers to "culpable mental state." Tenn. Code Ann. § 39-11-503(a). The point remains that a jury instruction about a defendant's alleged voluntary intoxication at the time he or she committed the offense under consideration is required only if the intoxication was such that it compromised the defendant's capacity for whatever culpable mental state the offense required.

required for premeditated murder or attempted premeditated murder. See, e.g., State v. Smith, No. M2001-01740-CCA-R3-CD, 2003 WL 22116629, at *18 (Tenn. Crim. App. Sept. 11, 2003) (rejecting claim of plain error for trial court's failure to instruct on voluntary intoxication where defendant was charged with second degree murder because, while the proof established that the defendant had an elevated blood alcohol content when tested after the shooting, "no expert testified as to how this may have impaired the Defendant's ability to act knowingly" and no expert "testified that alcohol levels like those found in the Defendant would affect his ability to act knowingly"); State v. Wallace, No. W2001-02894-CCA-R3-CD, 2003 WL 169045, at *5 (Tenn. Crim. App. Jan. 22, 2003) (rejecting claim that trial court committed plain error in failing to instruct the jury on voluntary intoxication in trial for especially aggravated robbery and attempted premeditated murder in part because, although the proof "arguably raised the issue of voluntary intoxication," there was no proof that the defendant "was incapable of forming the specific intent required for" the crimes charged). Moreover, Defendant's statement to the police reflects that Defendant had clear memories about his actions both preceding and during the shootings, belying any claim that he was so intoxicated as to be unable to form the culpable mens rea of intent and premeditation. See, e.g., King v. State, No. 03C01-9601-CR-00024, 1997 WL 416389, at *13 (Tenn. Crim. App. July 14, 1997), aff'd 989 S.W.2d 319 (Tenn. 1999). Accordingly, we hold that Defendant has failed to demonstrate that the trial court breached a clear and unequivocal rule of law when it failed to instruct the jury about Defendant's alleged voluntary intoxication. Defendant is not entitled to relief on this issue.

## E.  Jury Instruction on Duress[17]

Similarly to complaining about the trial court's failure to instruct the jury on voluntary intoxication, Defendant argues that the trial court committed reversible error by failing to instruct the jury about the general defense of duress.[18] Our criminal code provides that

> [d]uress is a defense to prosecution where the person or a third person is threatened with harm which is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous

[17] The Court of Criminal Appeals construed defense counsel's argument to the trial court at the original motion for new trial hearing to include an allegation that the trial court erred by failing to charge the jury on duress. The intermediate appellate court therefore addressed this issue. Our review of the motion for new trial hearing leads us to disagree that defense counsel raised this issue during argument. Indeed, in his brief to the Court of Criminal Appeals, Defendant acknowledged that he did not raise this issue until the *amended* motion for new trial (filed in May 2006) and asked for review under plain error. We therefore address this issue only under plain error review. See Bledsoe, 226 S.W.3d at 353.

[18] Defense counsel did not request a jury instruction on duress.

throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.

Tenn. Code Ann. § 39-11-504(a) (1997). The Sentencing Commission Comments to this provision add that "[t]his rare defense is present when a defendant commits an offense because another person threatens death or serious injury if the offense is not committed" and that "[t]he standard sufficient to excuse criminal conduct is that the compulsion must be immediate and imminently present and of such nature to produce a well-grounded fear of death or serious bodily harm. In addition, there must be no reasonable opportunity to escape the compulsion without committing an offense." Id. sentencing comm'n cmts.; see also State v. Robinson, 622 S.W.2d 62, 73 (Tenn. Crim. App. 1981).

A criminal defendant is entitled to have the jury instructed on the defense of duress only if it is "fairly raised by the proof." Tenn. Code Ann. § 39-11-203(c) (1997). Because duress is a general rather than an affirmative defense, a criminal defendant need not establish the elements of duress by a preponderance of the evidence in order to merit a jury instruction. Bledsoe, 226 S.W.3d at 355. "Rather, if admissible evidence fairly raises its applicability, the trial court is required to submit the defense to the jury." Id.

We have previously recognized that the defense of duress encompasses four elements. Id. at 357 n.7. In the context of this case, these four elements are (1) that Chris threatened to shoot Defendant if he did not assist in the attack upon the victims; (2) that Chris's threat to shoot Defendant continued throughout the time that the men gathered and walked over to the targeted apartment and throughout the attack; (3) that Defendant was unable to withdraw safely from the journey to the targeted apartment and the attack on the victims; and (4) that Defendant's urgent desire to avoid being shot by Chris clearly outweighed, by ordinary standards of reasonableness, the harm Defendant inflicted by assisting in the shooting. See id.; see also Tenn. Code Ann. § 39-11-504(a).

Defendant contends that the numerous violent altercations he had with Chris prior to the instant crimes were sufficient to "fairly raise" the defense of duress. We disagree. There is no proof in the record that Chris threatened Defendant in order to achieve his assistance in the attack upon the victims. Also, although Cornelius was standing with Chris at the door of the apartment immediately before the shooting began, he was able to run away from the scene after knocking on the door. According to Cornelius, Defendant was behind him while he knocked on the door and was therefore in an even better situation from which to withdraw safely from Chris. At least two of the four elements necessary to fairly raise the defense of duress were therefore not present in the proof at trial, and the trial court committed no breach

of a clear and unequivocal rule of law when it did not instruct the jury on duress. Defendant is not entitled to relief on this issue.

## CONCLUSION

Defendant's attempts to amend his motion for new trial after the trial court entered an order denying a new trial were a nullity. Accordingly, the only issues that were not waived for appellate purposes were those designated in Defendant's motion for new trial filed on February 22, 2005. Defendant is not entitled to relief on the basis of any of those issues. Having also reviewed for plain error the remaining issues, we hold that Defendant is not entitled to plain error relief on the basis of the trial court's erroneous admission of Sabrina Hatcher's statement to the police, the trial court's erroneous instruction on criminal responsibility, or the trial court's failure to instruct the jury on voluntary intoxication and duress. Accordingly, we affirm the judgment of the Court of Criminal Appeals. It appearing that Defendant is indigent, the costs of this cause are taxed to the State of Tennessee.

_____
CORNELIA A. CLARK, JUSTICE