# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### May 18, 2010 Session

## STATE OF TENNESSEE v. ARTURO JAIMES-GARCIA

### Direct Appeal from the Criminal Court for Davidson County
### No. 2006-D-3175      Mark J. Fishburn, Judge

### No. M2009-00891-CCA-R3-CD - Filed December 22, 2010

A Davidson County jury convicted the Defendant, Arturo Jaimes-Garcia, of multiple drug offenses relating to three different drug sales, and the trial court imposed an effective sentence of eighteen years in the Tennessee Department of Correction. On appeal, the Defendant contends: (1) the evidence is insufficient to sustain his convictions; (2) the Drug-Free School Zone statute is unconstitutionally vague and unconstitutional as applied to the facts of this case; (3) the trial court improperly enhanced his punishment because the State did not give him adequate notice of its intent to seek an enhanced sentence; (4) the State committed prosecutorial misconduct during its closing argument; and (5) three of the Judgment of Conviction forms contain errors. The State contends that this appeal should be dismissed because the Defendant's amended motion for new trial was not timely filed, and he failed to file a timely notice of appeal. After a thorough review of the record and applicable authorities, we conclude that the trial court improperly permitted the Defendant to file an amended motion for new trial. Therefore, we review the issue properly preserved by his original motion for new trial, the sufficiency of the evidence, and conclude that the evidence is sufficient to sustain all of his convictions. We conclude, however, that two of those convictions violate his double jeopardy protections. Those convictions are, therefore, merged or dismissed in accordance with the reasoning below. Further, we have reviewed for plain error the issues the Defendant failed to properly preserve but hold that the Defendant is not entitled to relief on any of those issues. This case is remanded for the entry of corrected judgments in accordance with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in part, Reversed in Part and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Chance Deason, Henderson, Tennessee (at trial) and Peter D. Heil (on appeal), Nashville, Tennessee, for the Appellant, Arturo Jaimes-Garcia a/k/a Antonio James.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; John Zimmerman and Kristen Menke, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Defendant's sale of cocaine in a school zone to a confidential informant on three occasions. For these offenses, a Davidson County grand jury indicted the Defendant for: one count of conspiracy to sell 300 grams or more of cocaine within 1000 feet of a school; two counts of sale of 26 grams or more of cocaine; one count of possession with intent to deliver 300 grams or more of cocaine within 1000 feet of a school; one count of sale of 300 grams or more of cocaine; and one count of possession with intent to sell over 0.5 grams of cocaine. At the Defendant's trial, the State presented the following evidence: Several officers, including James McWright, an officer with the Nashville Metro Police Department's 20th Judicial District drug task force, testified about the investigation that led to the arrest of the Defendant, his wife, his nephew, and his nephew's girlfriend. The investigation began when officers arrested Walter Sawyers, who agreed to cooperate with police and told police that a man named "Juan" supplied him with drugs. In cooperation with police, Sawyers arranged to purchase drugs from his supplier, "Juan," in a series of three transactions. Sawyers informed officers that "Juan's Uncle" sometimes assisted in the drug transactions.

Before the first drug transaction on August 3, 2006, officers knew only that Sawyers's supplier's name was "Juan" and that Juan and his uncle both participated in selling Sawyers drugs. Sawyers, who said he did not know where Juan or his uncle lived, contacted Juan by telephone and arranged the purchase of two ounces of cocaine for $1200. Officers gave Sawyers money to purchase the drugs. At the arranged time, Juan's uncle, who officers then determined was the Defendant, arrived and conducted the drug sale. Officers then followed the Defendant to apartment C-3 in the Holly Hills apartment complex, where the Defendant entered with a key, and the officers then began surveillance of his residence. Officer McWright followed the Defendant to multiple gas stations and apartment complexes that day before he terminated his surveillance. The officers intermittently conducted surveillance of the apartment they saw the Defendant enter, and they discovered that the Defendant also used apartment D-8 in the same apartment complex. Officers identified "Juan" as Juan Jeminez-Jaimes. Officer McWright obtained electric company records, which indicated that the electric bill for apartment C-3 was listed in the name Betsy Elizabeth Martinez, who he later learned was Jeminez-Jaimes's girlfriend, and the electric bill for apartment D-8 was listed in the Defendant's name.

In the second drug transaction, which occurred on August 8, 2006, Sawyers attempted to arrange a purchase of two ounces of cocaine from Jaminez-Jaimes for $1200. When Sawyers arrived, with $1200 of police drug buy money, he was met by the Defendant, who informed him that he thought Sawyers wanted to purchase two kilos of cocaine. Sawyers explained the mix-up, and Jeminez-Jaimes arrived and stayed with Sawyers while the Defendant returned to apartment D-8 with the two kilos of cocaine. The Defendant returned with a different amount of cocaine and inadvertently Sawyers ended up with eight ounces of cocaine, for which he had paid only $1200. After Sawyers left, Jeminez-Jaimes called Sawyers and asked him to return the drugs he had received in error. Sawyers told Jeminez-Jaimes that he would purchase another half kilo the following day, and also pay Jeminez-Jaimes for the extra drugs that he had received. Sawyers agreed to give the Defendant $12,800 for the half-kilo of cocaine and the extra cocaine he had received in error.

In the third drug transaction, which occurred on August 9, 2006, Officer McWright along with other officers set up surveillance of apartments C-3 and D-8. Officers were following both the Defendant and Juan Jeminez-Jaimes and communicating with each other via police radio. Shortly after noon, Officer McWright saw the Defendant, Betzy Martinez, Martinez's younger sister, and a child exit apartment C-3. The Defendant entered apartment D-8, and the other three people left the complex in a SUV. Officer McWright then saw Jeminez-Jaimes exit apartment C-3 and leave the complex in a different SUV. Officer McWright followed Jeminez-Jaimes to Nashville Auto Sales, which is two to three miles from the apartments.

Later that day Officer McWright conducted surveillance of apartment D-8 based upon Sawyers's arrangement to purchase a half-kilo of cocaine from Jeminez-Jaimes The officer observed the Defendant arrive at the apartments and speak to his wife, Antonia Diaz-Reyes. Diaz-Reyes went into apartment D-8, and the Defendant entered apartment C-3 using a key. The Defendant then left the apartment complex. Police officer Herbert Kajihara followed as the Defendant traveled on a road adjacent to Paragon Mill Elementary School on his way to another apartment complex. Officer Kajihara saw the Defendant stop at a three-way intersection, which dead-ended into the school. At that stop sign, where the Defendant stopped, he was within twenty-five feet of the school. The Defendant then turned left and drove past the school and traveled on to the apartment complex. When the Defendant arrived at the complex, he parked his car, opened the hood and the trunk, and stood near his car. It was the location of this drug sale that the State alleged was within a 1000 feet of a school zone.

After Sawyers arrived at the apartment complex parking lot, the Defendant took a bag of cocaine out of his trunk and gave Sawyers the cocaine. Sawyers gave the Defendant the money, which the Defendant "tossed" into the back seat of the Defendant's car. At that point, pursuant to Officer McWright's instructions, officers arrested the Defendant, who was still in possession of the $12,800 that Sawyers paid him. Officers retrieved the bag of

cocaine from Sawyers and arrested Jeminez-Jaimes, as well.

Upon arrest, Jeminez-Jaimes gave police a false identity, and he was found in possession of false identification. He carried $6139 in cash and one cell phone, and officers found another cell phone in his Tahoe. Officers identified the telephone numbers of these cell phones and determined that multiple calls had been placed between these phones and the Defendant's phone on the day of the drug sale. Phone records also indicated that calls were placed between the phone Jeminez-Jamines carried and the phone belonging to Sawyers. Officers examined the paper money found on Jeminez-Jaimes, and some of the money matched the photocopies they had of the drug buy money used by Sawyers to purchase drugs during the second drug buy.

Officer McWright testified that he had previously obtained search warrants for both apartments C-3 and D-8, and that, after arresting the Defendant and Jeminez-Jaimes, he went to the apartments in anticipation of executing those warrants. The officer, however, had to wait for other officers to become available to assist him, so he set up surveillance. During this surveillance, he saw Reyes exiting apartment D-8 carrying a trash bag, so he asked another officer to take her into custody and to seize the trash bag. Betzy Martinez came back to the apartment, and officers arrested her before she entered the apartment. Officers then executed search warrants on both apartments.

In apartment C-3, officers, assisted by K-9 officers, found a half-kilo of cocaine in a purple bag, which was inside a Christmas tree box. They also found baggies, Inositol powder, which is used to cut cocaine, photographs and paper work. In apartment D-8, officers found two small bags of cocaine inside a box of zip baggies, a digital scale, baggies, and $700 in cash. In D-8, officers also found the Defendant's ID cards, a pay stub from past employment in another State, and family photographs. Upon searching Martinez's SUV, officers determined that the SUV had been purchased by Jeminez-Jaimes.

On cross-examination, Officers McWright, Thomas, and Rigsby each testified that he never personally observed the Defendant within 1000 feet of a school zone during the August 9 drug sale. The officers said that the investigation revealed that Martinez listed her employer as Nashville Auto Sales. During the cross-examination of the other officers who testified, the officers testified that Inositol, which is used as a cutting agent for cocaine, is sold legally as a baby laxative or vitamin supplement. The officers agreed children were sometimes at the apartment, and the Inositol could have been for the children. On redirect, however, one officer noted that he saw no items belonging to a baby when he searched the apartment.

The State introduced audio recordings of the telephone calls between Sawyers and Jeminez-Jaimes setting up the drug buys. The State also introduced booking forms completed by the Defendant in which he listed his residence as apartment D-8 and did not

offer any employment information.

Walter Sawyers, the confidential informant, testified that the State offered him a plea deal in part because of his cooperation with police during this investigation. Sawyers recalled the events leading to his arrest, stating that he and his wife were arrested shortly after delivering twenty pounds of marijuana and, after searching his home, police found more marijuana and over $100,000. Sawyers agreed to plead guilty to conspiracy to deliver over seventy pounds of marijuana, a Class B felony, in exchange for a split confinement sentence of eight years with one year served in prison and the remainder on probation. His wife also reached an agreement with the State in which she would plead to a Class C felony and serve a suspended three-year sentence.

After his arrest, Sawyers cooperated with police by disclosing the name of his supplier, Jeminez-Jaimes, and placing a call to Jeminez-Jaimes asking to purchase one hundred pounds of marijuana, a transaction the two had earlier arranged. Because Jeminez-Jaimes did not have any marijuana, Sawyers called him and asked to purchase two ounces of cocaine. The two agreed to a price of $600 per ounce and a meeting place to exchange the money for the drugs. All of Sawyers telephone conversations with Jeminez-Jaimes were recorded and played for the jury. Sawyers said that, shortly after he arrived at the agreed meeting place, the Defendant brought him the drugs, and Sawyers gave the money to the Defendant. Immediately following the transaction, Sawyers went to the police precinct to give the purchased drugs to the police.

Sawyers testified that he called Jeminez-Jaimes to arrange the second drug transaction for two ounces of cocaine. Jeminez-Jaimes told him to go to the same meeting place. Jeminez-Jaimes arrived at the agreed upon location shortly after the Defendant and told Sawyers that the Defendant had brought two kilos, rather than the previously agreed upon two ounces. Jeminez-Jaimes said the Defendant was going to "go back" and "fix it." Sawyers said he and Jeminez-Jaimes stayed and talked while they waited for the Defendant to return. The Defendant arrived a short time later and handed Sawyers the cocaine wrapped in a red towel. Sawyers paid the Defendant and returned to the police precinct where he discovered he had received more cocaine than he paid for. Jeminez-Jaimes called him and asked him to return the extra drugs. Sawyers relayed this information to police, who told him to ask Jeminez-Jaimes if he could pay him for the extra drugs, and also purchase an additional half of a kilo the following day. Jeminez-Jaimes agreed.

The following day, the third drug transaction occurred, and Sawyers went to the agreed upon meeting place in the parking lot of an apartment complex. When Sawyers arrived, the Defendant was already present. The two exchanged money for drugs after which Sawyers went to the police precinct and gave police the drugs.

Sawyers admitted he had several previous convictions, which included: possession

of under .5 grams of cocaine, misdemeanor theft, misdemeanor criminal impersonation, possession of drug paraphernalia, resisting arrest, and escape. On cross-examination, Sawyers agreed he did not offer to cooperate with police until he was arrested on drug charges.

The State offered several witnesses who testified about Paragon Mills Elementary School. David Kline of the Metro Planning Department introduced a map he created that depicted the school with a 1000-foot ring around the school. Steve Keel with Metro Nashville Public Schools testified that Paragon Mills Elementary School had been in existence since 1965 and was open for enrollment on August 9, 2006, and that students likely were present at the school for registration at the time of the drug transaction. Keel agreed during cross-examination that none of the acts for which the Defendants were on trial endangered the children present at the school that day.

The State presented the testimony of two agents from the Tennessee Bureau of Investigations ("TBI") who testified about the substances received during the drug buys or as a result of the police search of apartments C-3 and D-8. Agent Dunlap testified that the substance received during the first drug buy was cocaine weighing a total of 55.5 grams. Agent Glenn said that the substance received during the second drug buy was cocaine weighing a total of 248.9 grams. Agent Glenn testified that he determined the substance received during the third drug buy was also cocaine that weighed 502.9 grams. Agent Glenn tested the substance found inside apartment C-3 and determined that it also was cocaine that weighed 251.6 grams. Agent Glenn tested the substance found inside apartment D-8 and determined it was cocaine packaged in two separate baggies, one weighing 8.9 grams and the other weighing 7 grams.

The Defendant testified, through an interpreter, that he traveled from his apartment complex to another apartment complex, on August 9, 2006, but he said he took a different route than the one described by the officers who had testified. The route he described was not within the school zone. The Defendant said that, when he arrived at the second apartment complex, he conducted the "transaction" with the informant. The Defendant did not deny meeting Sawyers. On cross-examination, the Defendant testified he had lived in Nashville for three or four months before he was arrested in this case. During that time, he looked for work but was unable to secure employment based upon his lack of a social security number.

The Defendant said he conducted the three drug transactions with Sawyers and that Jeminez-Jaimes told him to deliver the drugs to Sawyers. The Defendant said another person gave the cocaine to him, which he then placed in apartment C-3, but he said he did not "really know them." He said he got the cocaine from apartment C-3 and took it to be delivered. The Defendant said that, after each buy, he gave the money he received to Jeminez-Jaimes. The Defendant agreed that he did not speak English and that Sawyers did not speak Spanish,

so they need Jeminez-Jaimes, who spoke both, to interpret for them.

Jeminez-Jaimes testified that he was married and his "main residence" was with his wife in a location different from the apartments involved in this case. The Defendant, his uncle, sometimes borrowed money from him and he sometimes borrowed money from the Defendant. The two spoke on the phone frequently and spent the holidays together. Jeminez-Jaimes conceded that Betzy Martinez was his girlfriend with whom he rented apartment C-3. Jeminez-Jaimes said that, while the two shared an apartment, he visited Martinez usually twice a day but never spent the night in the apartment, instead returning to the home he shared with his wife. Jeminez-Jaimes denied any knowledge of the cocaine found in the apartment.

Jeminez-Jaimes said that he was employed part-time with a landscaping company, and he also bought, fixed up, and resold cars, which was, he said, quite profitable. Jeminez-Jaimes recalled that, around the time of these drug transactions, the Defendant told him that he needed his assistance communicating with another person. The Defendant gave him a telephone and told him to answer it and tell him what the person said. The Defendant told him that he did not have to deliver or touch "it," so there was not going to be a problem. Jeminez-Jaimes said he felt obligated to help his uncle because his uncle needed money and did not understand English.

Jeminez-Jaimes maintained that he only translated for the Defendant, who told him what to say to Sawyers and where to tell Sawyers to meet. The Defendant asked Jeminez-Jaimes to tell him what Sawyers said in response. Jeminez-Jaimes explained that Sawyers told Jeminez-Jaimes that he could not hear him on the cell phone he was using, and Jeminez-Jaimes opined that this was perhaps because he was using a prepaid cell phone. He then gave Sawyers his personal cell phone number, which he used to communicate with Sawyers. Jeminez-Jaimes testified that the Defendant was in charge of the drug deals, and Jeminez-Jaimes's role was simply to facilitate communication. Jeminez-Jaimes explained that he was carrying a large amount of money when he was arrested because he was on his way to Nashville Auto Sales to purchase two cars. He had borrowed $1000 from the Defendant and the remaining $5000 belonged to him. He said he did not share in the proceeds from these drug sales.

On cross-examination, Jeminez-Jaimes testified that he knew when he was interpreting that he was interpreting for purposes of a drug transaction.

Based upon this evidence, the Defendant was convicted of several offenses: Count One: conspiracy to sell 300 grams or more of cocaine within 1000 feet of a school zone, a Class A felony; Count Two: sale of 26 grams or more of cocaine, a Class B felony; Count Three: sale of 26 grams or more of cocaine, a Class B felony; Count Four: possession with intent to deliver 300 grams or more of cocaine within 1000 feet of a school zone, a Class A

felony; Count Five: sale of 300 grams or more of cocaine, a Class B felony; and Count Seven: possession with intent to sell or deliver 26 grams or more of cocaine. The trial court merged Count Five with Count Four and, after ordering all his sentences be served concurrently, sentenced the Defendant to an effective sentence of eighteen years.

## II. Analysis

On appeal, the Defendant contends: (1) the evidence is insufficient to sustain his convictions; (2) the Drug-Free School Zone statute is unconstitutionally vague and unconstitutional as applied to the facts of this case; (3) the trial court improperly enhanced his punishment because the State did not give him adequate notice of its intent to seek an enhanced sentence; (4) the State committed prosecutorial misconduct during its closing argument; and (5) three of the Judgment of Conviction forms contain errors and must be corrected.

## A. Motion for New Trial

After the verdict in this case, the Defendant's counsel expressed concern that the jury had convicted the Defendant of conspiracy to sell 300 grams or more of cocaine in a school zone but had only convicted Jeminez-Jaimes of conspiracy to sell 300 grams or more of cocaine, omitting the school zone enhancement. The parties posited to the court that it should delete the drug-free school zone enhancement from the judgment. The trial court agreed, and entered a judgment of conviction omitting the school zone enhancement. The trial court entered the final judgments in this case on December 17, 2007.

The Defendant filed his first motion for new trial on January 8, 2008. Following a hearing on February 8, 2008, the trial court denied the Defendant's motion for new trial, as evidenced by the trial court's written minute entry.

On February 25, 2008, the trial court appointed the Defendant appellate counsel. The Defendant's appellate counsel filed a motion to allow amendments to the motion for new trial. At a hearing on this motion, the Defendant contended that the trial court retained jurisdiction over the case because, while the trial court made a minute entry of its denial of the motion, it did not enter a written order denying the motion. The trial court agreed and granted the motion to amend the motion for new trial on April 10, 2008.

On November 13, 2008, the Defendant filed an amended motion for new trial. At the hearing on this motion, the Defendant's counsel reminded the trial court that, after the conclusion of proof in the case, the jury had convicted the Defendant in Count 1 for conspiracy to sell 300 grams or more of cocaine in a school zone but found Jeminez-Jaimes not guilty of conspiracy to sell 300 grams or more of cocaine in a school zone, finding him guilty of only the offense of conspiracy to sell 300 grams or more of cocaine, without the

school zone enhancement. The parties therefore agreed the trial court should amend the Defendant's guilty verdict to the offense of conspiracy to sell 300 grams or more of cocaine, but not in a school zone. The Defendant asserted that, because this was done after the jury verdict was rendered, the trial court had no authority or jurisdiction to amend the verdict. The Defendant's counsel asked the trial court to declare a mistrial on this basis or, because one cannot alone be found guilty on a conspiracy theory of criminal responsibility, to enter a judgment of not guilty.

In a written order dated April 8, 2009, the trial court denied the Defendant's amended motion for new trial. The trial court acknowledged that it did not have the authority to modify the jury's verdict to reflect the lesser-included offense of conspiracy to sell cocaine not in a school zone. The trial court ordered:

> Since the jury found [the Defendant] and Mr. J[e]m[i]nez-Jaimes guilty of conspiracy to violate T.C.A. 39-14-497(j)(5), then the conspiracy verdicts are valid. The jury then found beyond a reasonable doubt that Mr. Jaimes-Garcia had committed an overt act individually i.e. driving within a designated school zone en route to a predetermined drug sell, in furtherance of the conspiracy. Consequently, the Court did err in not sentencing Mr. Jaimes-Garcia under the [Drug Free School Zone] enhancement statute T.C.A. 39-17-432. Accordingly, an amended judgment will be entered to sentence the Defendant according to the provisions of the enhancement statute.

The trial court also in its order merged Count 4, possession with intent to deliver more than 300 grams of cocaine with Count 5, sale of more than 300 grams of cocaine, explaining that double jeopardy prohibits multiple drug convictions arising out of a single drug transaction. Finally, the trial court found that double jeopardy required that Count 7 be dismissed with prejudice. It explained that Count 7 involved a conviction for possession with intent to sell .5 grams or more of cocaine on August 9, 2006 (the cocaine found in the Defendant's apartment pursuant to a search a few hours after his arrest). Therefore, the trial court dismissed Count 7 with prejudice because dual convictions for possession with intent cannot stand where law enforcement caused the defendant to divide the drugs for purposes of selling or delivering only a portion of the whole amount. The Defendant filed his notice of appeal on April 16, 2009.

In this appeal the State first contends that the Defendant's appeal should be dismissed because his notice of appeal was not timely filed and he has not sought a waiver of the timeliness requirement. Further, the State argues that the Defendant did not file a timely amended motion for new trial and that the trial court was without authority to extend the time during which the Defendant could file an amended motion for new trial. We first address the issue regarding the amendment to the Defendant's motion for a new trial.

## A. Amended Motion for New Trial

At the time the Defendant moved to amend his motion for new trial, neither the parties nor the trial judge had the benefit of the Tennessee Supreme Court's recent holding that amendments to timely filed motions for new trial may be had '*until* the day of the hearing on the motion for new trial,' Tenn. R. Crim. P. 33(b) (emphasis added), but not after the trial court has entered an order denying a new trial. *State v. Hatcher*, 310 S.W.3d 788, 803 (Tenn. 2010). The court advised:

> [T]rial courts should not hold any hearing on a motion for new trial until a reasonable time after the sentencing has been held, sentence has been imposed, and the judgment order entered. If the defense files a timely motion for new trial, the trial court should provide the defense with ample opportunity to amend the motion prior to holding the new trial hearing. If new counsel is sought and obtained, additional time for amendments to the motion for new trial may be granted as necessary. *Once the hearing on the motion for new trial is heard and an order denying a new trial has been entered, however, motions to make additional amendments must be denied.*

*Id.* at 788 (emphasis added).

In this case, the trial court, based upon its understanding that only the entry of a written order denying a motion for new trial divests a trial court of jurisdiction over the motion, allowed the Defendant to amend his motion for new trial despite its already having made a minute entry of the motion's denial. Again, at the time the trial court took this action, April 10, 2008, it did not have the benefit of a recent Tennessee Supreme Court's holding on this issue. On May 5, 2009, our highest court released an opinion in which it addressed the issue of whether a "minute entry is an 'entry of the order denying a new trial' under Tennessee Rule of Appellate Procedure 4(c), which triggers the time for filing an appeal, and therefore, whether this minute entry is sufficient to confer jurisdiction on the intermediate court." *State v. Byington*, 284 S.W.3d 220, 225 (Tenn. 2009). The Court construed the language of Tennessee Rule of Criminal Procedure 33 to mean that:

> [U]nless a party moves the trial court to set forth findings of fact and conclusions of law, the court's order need state only whether the motion for new trial was granted or denied. The minute entry under scrutiny in [the *Byington*] case states that the defendant's motion for new trial was denied. Therefore, we believe that it suffices as a written order required under Tennessee Rule of Appellate Procedure 4(c) to confer appellate jurisdiction in a criminal case.

*Id.* at 226. The Court then, as a final note on the issue, stated:

[A]lthough we hold that a minute entry is sufficient to confer appellate jurisdiction under Rule 4 in a criminal case, better practice dictates that the trial court enter a written order. Thus, we strongly encourage a trial court to enter a written order separate from the minute entry when denying a motion for new trial.

*Id*.

In accordance with the Tennessee Supreme Court's holding in *Byington*, we conclude in this case that the trial court's minute entry denying the Defendant's motion for new trial, entered on February 8, 2008, was sufficient to confer jurisdiction of the case with the appellate court. Therefore, the trial court was without jurisdiction after February 8, 2008, and had no authority to allow the Defendant to amend his motion for new trial. All proceedings in the trial court following the trial court's minute entry denying the Defendant's motion for new trial on February 8, 2008, would be of no legal effect.

## B. Notice of Appeal

Given our conclusion that the trial court's February 8, 2008, minute entry conferred jurisdiction of the Defendant's case to the appellate court, the Defendant had thirty days after this date to file his notice of appeal. Tenn. R. App. P. 4(c). The Defendant, however, did not file his notice of appeal until April 16, 2009.

"In all criminal cases, the notice of appeal document is not jurisdictional and the filing of such document may be waived in the interest of justice." Tenn. R. App. P. 4(a). Given, however, the fact that the parties and trial court did not have the benefit of our Supreme Court's holding, we conclude the interest of justice is served by waiver of the untimely filing of the Defendant's notice of appeal. Accordingly, we turn to address the Defendant's remaining issues.

## C. Issue Preserved by Original Motion for New Trial.

The only issue properly preserved is the issue raised in the Defendant's original motion for new trial. In that motion, the Defendant contended, as relevant to this appeal, that the evidence was insufficient to sustain his convictions. When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn.

Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

### 1. Count 1: Conspiracy to Sell 300 Grams or More of Cocaine within 1000 Feet of School Property

The Defendant asserts that, in Count 1, the evidence does not sufficiently establish the elements of conspiracy or a violation of the drug-free school zone statute, Tennessee Code Annotated section 39-17-432(b). The Defendant contends that he was convicted of

conspiracy to "sell" cocaine in a school zone, but that there was not proof of any agreement between himself and Jeminez-Jaimes to sell the cocaine within 1000 feet of a school zone. Therefore, he asserts, the essential elements of "conspiracy" to "sell" cocaine "in a school zone" have not been met. Further, the Defendant contends that, whereas the purpose of the drug-free school zone statute is to protect children, his alleged driving through a school zone was not "conduct . . . sufficient to establish a violation of the intent and language" of the statute. The Defendant recognizes that the Tennessee Supreme Court has held otherwise, but he states that retroactive application of the Supreme Court's decision would violate his due process rights. *State v. Vasques*, 221 S.W.2d 514, 523 (Tenn. 2007); *see also Bouie v. City of Columbia*, 378 U.S. 347 (1964).

In Count 1, the Defendant was charged and convicted of conspiracy to sell 300 grams or more of cocaine. T.C.A. § 39-17-417(a)(3) (stating it is an offense for a person to knowingly sell a controlled substance); T.C.A. § 39-17-408(b)(4) (defining cocaine as a controlled substance); T.C.A. 39-12-103(a) (defining conspiracy). When the amount involved is more than 30 grams, the offense is a Class A felony. T.C.A. § 39-17-417(j)(5). As previously stated, the Defendant was charged with conspiracy, an offense that requires that:

> (a) The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.

> (b) If a person guilty of conspiracy, as defined in subsection (a), knows that another with whom the person conspires to commit an offense has conspired with one (1) or more other people to commit the same offense, the person is guilty of conspiring with the other person or persons, whether or not their identity is known, to commit the offense.

> (c) If a person conspires to commit a number of offenses, the person is guilty of only one (1) conspiracy, so long as the multiple offenses are the object of the same agreement or continuous conspiratorial relationship.

> (d) No person may be convicted of conspiracy to commit an offense unless an overt act in pursuance of the conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired.

T.C.A. § 39-12-103(a)-(d). To prove the existence of a conspiratorial relationship, the State may rely upon a "mutual implied understanding" existing between or among the parties. *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993). The conspiracy need not

be proven by production of an official or formal agreement, in writing or otherwise. *Id*. The conspiracy may be demonstrated by circumstantial evidence and the deportment of the participants while undertaking illegal activity. *Id*. Conspiracy connotes harmonization of design, not coequal participation in the minutia of every criminal offense. *Id*.

The State also alleged, and the jury found, that such crime took place within 1000 feet of a school. T.C.A. § 39-17-432. Tennessee Code Annotated section 39-17-432, the Drug Free School Zone Act, states:

> A violation of § 39-17-417, or a conspiracy to violate such section, that occurs on the grounds or facilities of any school or within one thousand feet (1,000') of the real property that comprises a public or private elementary school, middle school, secondary school, preschool, child care agency, or public library, recreational center or park shall be punished one (1) classification higher than is provided in § 39-17-417(b)-(I) for such violation.

T.C.A. § 39-17-432(b) (2005). This section is part of the Drug-Free School Zone Act, which is intended to "provid[e] all students in this state an environment in which they can learn without the distractions and dangers that are incident to the occurrence of [illegal] drug activity in or around school facilities." T.C.A. § 39-17-432(a); *see also State v. Fields*, 40 S.W.3d 435, 439 (Tenn. 2001).

This Court has previously held that Tennessee Code Annotated section 39-17-432 does not itself criminalize manufacturing, delivering, selling, or possessing a controlled substance; rather, it merely imposes a harsher *penalty* for violations of Tennessee Code Annotated section 39-17-417 occurring within a school zone. *State v. Smith*, 48 S.W.3d 159, 167-68 (Tenn. Crim. App. 2000). When so noting, we stated:

> Indeed, the only way to punish an offender under the Drug-Free School Zone Act is to first determine his sentence under Tenn. Code Ann. § 39-17-417. *Id*. Moreover, both the caption of the Act and the policy statement set forth in subsection (a) of the Act reflect the purpose of the legislature, not to create a new offense, but rather to create drug-free school zones by enhancing penalties for violations of Tenn. Code Ann. § 39-17-417 occurring inside the zones. *See Dorrier v. Dark*, 537 S.W.2d 888, 892 (Tenn. 1976) (in determining legislative intent, we look to the entire statute, including the caption and policy statement which provide the purpose, objective, and spirit behind the legislation). The caption to Tenn. Code Ann. § 39-17-432 states, "Drug-Free School Zone-*Enhanced criminal penalties for violations within zone*." (Emphasis Added). The policy statement similarly expresses an intent to create drug-free school zones by imposing "enhanced and mandatory minimum sentences" for drug offenses occurring inside a school zone. Tenn. Code Ann. § 39-17-432(a).

*Smith*, 48 S.W.3d at 168.

We disagree with the Defendant's assertion that, in order to sustain his conviction, the State must have proved that the "conspiracy" occurred within the school zone. This would, in fact, in many instances defeat the purpose of the act. Quite logically, the conspiracy to sell the drugs could have occurred anywhere and there may be an overt act by one of the conspirators that occurred inside a school zone. To hold otherwise would undermine the Legislature's intent when it enacted this statute.

We conclude that the evidence, viewed in the light most favorable to the State, proved that the Defendant and Jeminez-Jaimes conspired to sell more than 300 grams of cocaine. The confidential informant contacted Jeminez-Jaimes on several occasions to ask to purchase drugs. Both Jeminez-Jaimes and the Defendant testified that Jeminez-Jaimes then relayed to the Defendant the details of his conversations with the confidential informant, including the quantity of drugs the informant wished to purchase and the location of the agreed meeting place. The evidence supports that both actors knowingly engaged in the sale of drugs. *See State v. Perkinson*, 867 S.W.2d 1, 5 (Tenn. Crim. App. 1992). The evidence supports that both actors acted for the purpose of promoting or facilitating the offense: Jeminez-Jaimes took and relayed information about the drug sale, and the Defendant delivered the drugs. *See Id*. Further, the evidence supports that both actors acted overtly in furtherance of the agreement to sell drugs. *Id.* Jeminez-Jaimes played a key role in arranging the location of the sale, which was within a school zone, and without Jeminez-Jaimes's assistance in translating the time and location of the sale to Sawyers, the sale would not have taken place.

The jury, by its verdict, concluded that the Defendant's overt act took him into a school zone, triggering the provisions of Tennessee Code Annotated 39-17-432, the drug-free school zone statute. The Defendant admitted that he delivered the drugs in this case. He testified he took a route different from that which police officers testified he took. His route, he said, did not take him within 1000 feet of school property. Several police officers were involved in following the Defendant to his meeting with the confidential informant on the date in question. Officer Kajihara testified that the Defendant pulled up to a stop sign at a T intersection that dead-ended into Paragon Mills Elementary School. The Defendant was, at that point, only twenty-five feet from school property. The State introduced evidence that Paragon Mills Elementary School had been in existence since 1995 and was open for enrollment on August 9, 2006, meaning that there were likely students there. The State also introduced a map that depicted the school and a ring around the school at 1000 feet.

On appeal, the Defendant contends that, even if this evidence proves he drove through a school zone, driving through a school zone is not sufficient to establish a violation of Tennessee Code Annotated section 39-17-432. He acknowledges that the Tennessee Supreme Court has stated otherwise in *State v. Vasques*, 221 S.W.3d 514, 523 (Tenn. 2007), but asserts that retroactive application of the *Vasques* dictum would violate his due process.

In *Vasques*, our highest court was presented with a factual scenario that involved a conspirator to a drug sale traveling through a school zone. The Court concluded the evidence was sufficient to sustain the jury's verdict of guilty as to the conspiracy to possession with intent to sell a substantial quantity of marijuana within 1000 feet of school property. In so doing, the Court stated, "[W]e reject [the defendant's] argument that simply traveling through a school zone is not enough to apply the provisions of the Drug-Free School Zone Act." *Id*. at 523. Further, the United States Court of Appeals for the Third Circuit has noted that, regardless of a defendant's intent to distribute drugs within a school zone:

> the mere presence of substantial quantities of drugs increases the risk of gunfire and other violence . . . . In addition, a person possessing drugs may abandon them while fleeing from the police . . . . The drugs may also be lost or stolen near a school and may then find their way into students' hands.

*United States v. Rodriguez*, 961 F.2d 1089, 1094 (3d Cir. 1992); *see also United States v. Wake*, 948 F.2d 1422, 1430-34 (5th Cir. 1991); *United States v. Ortiz*, 146 F.3d 25, 29 (1st Cir. 1998).

In accordance with these authorities, we conclude that the evidence sufficiently establishes that the Defendant traveled through a school zone on his way to meet the confidential informant on August 9, 2006. The conduct by the Defendant sufficiently supports the trial court's finding that he violated the Drug-Free School Zone Act; thereby making the sentencing enhancements of that statute applicable to the Defendant's statute.

We do not find persuasive the Defendant's argument that retroactive application of the decision in *Vasques* would violate his right to due process. A "case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government [or] . . . if the result was not dictated by precedent existing at the time the defendant's conviction became final." *Teague v. Lane*, 489 U.S. 288, 301 (1989) (citations omitted); *see also Van Tran v. State*, 66 S.W.3d 790, 810-11 (Tenn. 2001). In other words, "a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." *Van Tran*, 66 S.W.3d at 809 (citing *Teague*, 489 U.S. at 301 and *Meadows v. State*, 849 S.W.2d 748, 751 (Tenn. 1993)). The Tennessee Supreme Court's decision in *Vasques* was a clarification of the scope of a statute that was in effect at the time that the Defendant committed the drug sales in this case. The case did not announce a new rule and does not constitute an impermissible application of the law to the Defendant. The Defendant is not entitled to relief on this issue.

Finding that the evidence is sufficient as to the Defendant's conviction in Count 1, we now address the Defendant's concerns about the judgment form for this conviction. He asserts that the trial court erred when it imposed his eighteen-year sentence at 100%. He

states that the Drug-Free School Zone Act requires that a defendant serve 100% of his sentence only if he is sentenced to the statutory minimum within his range. Here, the Defendant's sentence was enhanced by three years, from fifteen to eighteen years. Therefore, he states, the trial court erred when it sentenced him to serve his sentence at 100%.

The governing statute regarding release eligibility for a violation of the Drug-Free School Zone Act can be found in Tennessee Code Annotated section 39-17-432(c), (d), and (e), which provides for release eligibility upon the "service of the entire minimum sentence for [the] defendant's appropriate range." (2006). Therefore, a defendant sentenced as a Range I offender is eligible for release after the completion of fifteen years' imprisonment. This Court noted in *Terrance Lavar Davis v. State* that "a violation of the Drug-Free School Zone Act is not one of the enumerated offenses for which the legislature has mandated a defendant serve one hundred percent prior to consideration for release." No. M2009-00011-CCA-RM-HC, 2009 WL 961777, at *3 (Tenn. Crim. App., at Nashville, Apr. 8, 2009) (citing T.C.A. § 40-35-501(i)(2); T.C.A. § 39-17-432(d) ("the provisions of title 40, chapter 35, part 5, relative to release eligibility status and parole, shall not apply to or authorize the release of a defendant sentenced for a violation of [the Drug-Free School Zone Act] prior to the service of the entire minimum sentence for such defendant's appropriate range of sentence")), *perm. app. granted* (Tenn. Aug. 24, 2010). Thus, a Range I sentence of eighteen years with a 100% release eligibility exists nowhere within the sentencing authority of the Drug-Free School Zone Act.

Therefore, we remand this case to the trial court for entry of an amended judgment reflecting that the Defendant is sentenced to eighteen years for his conviction in Count 1 and that he is required to serve fifteen years of this sentence at 100%. On this judgment of conviction, the trial court should check the box indicating that the Defendant is sentenced pursuant to the "Drug Free Zone" and omit from the "special conditions" section of the judgment that the Defendant serve eighteen years at 100%.

### 2. Count 2 and Count 3: Sale of 26 Grams or More of Cocaine

The Defendant's original motion for new trial asserted that the evidence was insufficient to sustain any of his convictions. Two of these convictions were for the sale of 26 grams or more of cocaine. Tennessee Code Annotated section 39-17-417(a)(3) makes it an "offense" for a defendant to "[s]ell a controlled substance." (2006). "'Controlled substance' means a drug, substance, or immediate precursor in Schedules I through VI of §§ 39-17-403–39-17-415." T.C.A. 39-17-402 (2006). Cocaine is a Schedule II drug. T.C.A. § 39-17-408(b)(4) (2006). A violation of subsection (a) with respect to 26 grams or more of cocaine is a Class B felony and may result in a fine of not more than two hundred thousand dollars ($200,000). T.C.A. § 39-17-417(i)(5) (2006).

Viewed in the light most favorable to the State, the evidence shows that the police

worked in cooperation with Sawyers, a confidential informant, who contacted the informant's supplier, Jeminez-Jaimes, by telephone and arranged with him the purchase of two ounces of cocaine for $1200. On August 3, 2006, officers gave Sawyers money to purchase the drugs. At the arranged time, the Defendant arrived at the agreed upon location and gave the informant two ounces of cocaine in exchange for the $1200. Police officers retrieved this cocaine from the informant and TBI Agent Dunlap testified that the substance received during the first drug buy was cocaine weighing a total of 55.5 grams. This evidence supports the Defendant's conviction in Count 2 for the sale of 26 grams or more of cocaine.

Officers arranged a second drug buy to be conducted on August 8, 2006. The confidential informant again attempted to arrange a purchase of two ounces of cocaine from Jeminez-Jaimes for $1200. When Sawyers arrived at the agreed location, with $1200 of police drug-buy money, he was met by the Defendant, who, with Jeminez-Jaimes translating, informed him that he thought Sawyers wanted to purchase two kilos of cocaine. The informant explained that he wanted to purchase only two ounces of cocaine, and Jeminez-Jaimes stayed with the informant while the Defendant returned to apartment D-8 with the two kilos of cocaine. The Defendant returned to Sawyers with a different amount of cocaine. Due to the confusion, Sawyers ended up with eight ounces of cocaine when he had only paid $1200 for two ounces.. This lead to the third drug buy, during which Sawyers paid the Defendant additional money for the eight ounces of cocaine he had received. Police retrieved the eight ounces of cocaine from the informant after the August 8 drug buy, and TBI Agent Glenn said that the cocaine received during the second drug buy weighed 248.9 grams. This evidence is sufficient to support the Defendant's conviction in Count 3 for the sale of 26 grams or more of cocaine.

### 3. Count 4: Possession With Intent to Deliver 300 Grams or More of Cocaine within 1000 Feet of a School Zone

This Count involved the Defendant's actions during the August 9, 2006, drug sale. To convict the Defendant of the cocaine possession offense in Count 4, the jury must have found that the Defendant knowingly possessed cocaine within 1000 feet of real property that comprised a public or private school with the intent to resell and that the amount of the cocaine possessed exceeded 300 grams. T.C.A. §§ 39-17-417(j)(5), -432(b). This offense is a Class A felony. T.C.A. § 39-17-417(j)(5). This offense is also subject to the Drug Free School Zone Act provision, which mandates that those convicted pursuant to this statute serve the minimum of the sentence within their applicable range at 100%. T.C.A. § 39-17-432(c),(d), & (e). The evidence presented at trial, viewed in the light most favorable to the State, proved that on August 9, 2006, the Defendant traveled from his apartment to the parking lot of another apartment complex to complete a drug transaction. On his way, police officers, who were following him, observed the Defendant's route, which took him to a "T" intersection that dead-ended into Paragon Mills Elementary School. At this intersection, where the Defendant stopped at a stop sign, the Defendant was twenty-five feet from the

school, which was open for enrollment on August 9, 2006. The Defendant then traveled on to the parking lot of the apartment complex, where he gave Sawyers cocaine in exchange for money. TBI Agent Glenn weighed the cocaine at 502.9 grams. This evidence is sufficient to sustain the jury's conviction in Count 4.

### 4. Count 5: Sale of 300 Grams or More of a Substance Containing Cocaine

We now turn to address whether the evidence was sufficient to sustain the Defendant's conviction in Count 5 for Sale of 300 grams or more of cocaine. In Count 5, the State alleged that the Defendant sold cocaine to the confidential informant on August 9, 2006. The cocaine in this transaction was the same as the cocaine involved in the Defendant's conviction in Count 4 for possession of cocaine in a school zone.

Tennessee Code Annotated section 39-17-417(a)(3) makes it an "offense" for a defendant to "[s]ell a controlled substance." "'Controlled substance' means a drug, substance, or immediate precursor in Schedules I through VI of §§ 39-17-403–39-17-415." T.C.A. § 39-17-402. Cocaine is a Schedule II drug. T.C.A. § 39-17-408(b)(4). Because this count involved 300 grams or more of cocaine, it is a Class A felony. T.C.A. § 39-17-417(j)(5).

While the evidence is sufficient to prove both convictions, both convictions may not stand in the face of double jeopardy concerns. Merger of convictions is sometimes necessary in order to remedy the double jeopardy problem of multiple punishment. *State v. Beard*, 818 S.W.2d 376, 379 (Tenn. Crim. App. 1991). The double jeopardy clause in the United States Constitution provides that no person "shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . ." U.S. Const. amend V. Similarly, the Tennessee Constitution states that "no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. I, § 10. Three fundamental principles underlie double jeopardy: (1) protection against a second prosecution after an acquittal; (2) protection against a second prosecution after conviction; and (3) protection against multiple punishments for the same offense. *State v. Burris*, 40 S.W.3d 520, 524 (Tenn. Crim. App. 2000).

The seminal case for double-jeopardy analysis of multiple count, same statute crimes is *State v. Phillips*, 924 S.W.2d 662 (Tenn. 1996), a sex-offense case. Although the inquiry in *Phillips* is specific to sex-related crimes, "[i]ts principles . . . have been adapted for other types of crimes, as well." *State v. Easterly*, 77 S.W.3d 226, 231 (Tenn. Crim. App. 2001) (citing generally *State v. Epps*, 989 S.W.2d 742, 745 (Tenn. Crim. App. 1998)). The *Easterly* Court listed those principles as:

> 1. A single offense may not be divided into separate parts; generally, a single wrongful act may not furnish the basis for more than one criminal prosecution;

2. If each offense charged requires proof of a fact not required in proving the other, the offenses are not multiplicitous; and

3. Where time and location separate and distinguish the commission of the offenses, the offenses cannot be said to have arisen out of a single wrongful act.

*Id.* at 231 (citing *Epps*, 989 S.W.2d at 745, and *Phillips*, 924 S.W.2d at 665). Other matters to be considered are "the nature of the act; the time elapsed between the alleged conduct; the intent of the accused, i.e., was a new intent formed; and cumulative punishment . . . ." *Id.* at 231-32. None of these factors other than the nature of the act is determinative. *Id*. at 232.

In *State v. Williams*, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981), this Court specifically addressed whether convictions for possession of cocaine and sale of the same cocaine violated double jeopardy provisions. We stated:

"Possession" may be actual or constructive. "(C)onstructive possession requires that a person knowingly have 'the power and the intention at a given time to exercise dominion and control over an object, either directly or through others.'" *United States v. Craig*, 522 F.2d 29 (6th Cir. 1975). "In essence, constructive possession is the ability to reduce an object to actual possession." *United States v. Martinez*, 588 F.2d 495 (5th Cir. 1979). In view of this interpretation of "possession," we find it impossible to conceive of a situation where a defendant could sell narcotics without being in possession, at least constructively, of those narcotics.

*Id*. Based upon this, the *Williams* Court reversed and dismissed the defendant's conviction therein for possession with intent to sell hydromorphone, but affirmed his conviction for the sale of that same hydromorphone. *Id*.; *cf State v. Luis Perez*, No. W2004-00980-CCA-R3-CD, 2005 WL 1114463, at *5 (Tenn. Crim. App., at Jackson, May 11, 2005) (holding that double jeopardy protections precluded defendant's convictions for both the possession and sale of marijuana), *no Tenn. R. App. 11 application filed*. *But see State v. Jose D. Holmes*, No. 02C01-9411-CR-00251, 1995 WL 695127 (Tenn. Crim. App., at Jackson, Nov. 22, 1995) (holding in dicta that possession of cocaine and sale of cocaine require proof of different statutory elements.) "As previously mentioned, the elements of the offense of possession of cocaine with intent to sell are (1) the defendant knowingly possessed cocaine and (2) the defendant intended to sell cocaine. T.C.A. § 39-17-417(a)(4) (1994 Supp.). In contrast, the elements of the offense of sale of cocaine are: (1) that the defendant actually sold cocaine; and (2) that the defendant acted knowingly. T.C.A. § 39-17-417(a)(3) (1994 Supp.)"), *perm. app. denied* (Tenn. Apr. 8, 1996).

The fact that the Defendant's conviction involves the Drug Free School Zone Act

makes analysis of the present issue slightly more complex. However, as we previously held, proof that the drug crime was committed in a school zone is not an essential element of the 39-17-417 offense. Rather, it is an element that, if proven, merely imposes a harsher *penalty* for violations of Tennessee Code Annotated section 39-17-417 occurring within a school zone. Accordingly, the sale of the cocaine in Count 5 necessarily involved his possession of cocaine for which he was convicted in Count 4. Both convictions can not properly stand as these dual convictions would violate the Defendant's double jeopardy protections. Because the Drug-Free School Zone Act applies to Count 4, thereby making it mandatory that the Defendant serve fifteen years of his sentence at 100%, Count 5 should be merged into Count 4. We remand this case to the trial court for entry of one judgment of conviction in Count 4, which reflects the merger of Count 5.

### 5. Count 7: Possession With Intent to Sell .5 Grams or More of Cocaine

We now determine whether the evidence is sufficient to sustain the Defendant's conviction in Count 7 for possession with intent to sell or deliver 0.5 grams or more of cocaine. In Count 7, the State contended that the Defendant intended to sell or deliver the cocaine, which was packaged in two separate baggies, one weighing 8.9 grams and the other weighing 7 grams, found in apartment D-8.

As previously stated, it is an offense for a defendant to possess cocaine with the intent to manufacture, deliver, or sell the cocaine. T.C.A. § 39-17-417(a)(4), T.C.A. § 39-17-402, T.C.A. § 39-17-408(b)(4). Because this count involved more than .5 grams but less than 26 grams of cocaine, it is a Class B felony. T.C.A. § 39-17-417(c)(1).

The testimony at trial proved that the Defendant went to the location of the second drug sale, on August 8, 2006, with more cocaine than the agreed purchase amount. Law enforcement officers followed him back to his apartment where he divided the cocaine, leaving some portion thereof in his home, and returned to the site of the drug sale where he conducted the drug transaction with Sawyers. After the third drug sale, on August 9, 2010, officers searched the Defendant's apartment where they found the cocaine that he had divided for sale.

As previously stated, the double jeopardy clause in the Unites States Constitution provides that no person "shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . ." U.S. Const. amend V. Similarly, the Tennessee Constitution states that "no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. I, § 10. Three fundamental principles underlie double jeopardy: (1) protection against a second prosecution after an acquittal; (2) protection against a second prosecution after conviction; and (3) protection against multiple punishments for the same offense. *State v. Burris*, 40 S.W.3d 520, 524 (Tenn. Crim. App. 2000). Further, again as listed by the *Easterly* Court:

1. A single offense may not be divided into separate parts; generally, a single wrongful act may not furnish the basis for more than one criminal prosecution;

2. If each offense charged requires proof of a fact not required in proving the other, the offenses are not multiplicitous; and

3. Where time and location separate and distinguish the commission of the offenses, the offenses cannot be said to have arisen out of a single wrongful act.

77 S.W.3d at 231. In *Easterly*, the Court went on to hold that multiple convictions for cocaine possession could not stand where law enforcement officers had induced him to separate the cocaine for sale. *Id*. at 232. The Court reasoned, "The defendant was simultaneously in possession of the cocaine he kept in his home . . . and the subdivided portion he took [to sell], and the locations were different only because of the state's involvement." *Id*. The Court dismissed the presentment with prejudice.

Applying the *Easterly* reasoning to the case under submission, we conclude that the Defendant's conviction in Count 7 for possession of cocaine cannot stand. Like the defendant in *Easterly*, the Defendant herein was simultaneously in possession of the cocaine in his home, that was left there when he divided the cocaine to sell the correct amount to the State's confidential informant, and the cocaine that he possessed at the time of that sale. He was convicted for the sale of cocaine, and, as we previously stated, one must necessarily "possess" cocaine in order to sell that same cocaine. Accordingly, we reverse the Defendant's conviction in Count 7 and dismiss the indictment with prejudice.

### C. Issues Reviewed for Plain Error

In the Defendant's amended motion for new trial he contended, as relevant to this appeal, that: (1) the Drug-Free School Zone statute is unconstitutionally vague and unconstitutional as applied to the facts of this case; (2) the Defendant is subject to enhanced punishment provisions of T.C.A. § 39-17-432 where the prosecution failed to give adequate notice of its intent to seek other than standard sentencing; and (3) the prosecution committed prosecutorial misconduct during closing arguments.

Because "[r]eview generally will extend only to those issues presented for review," Tenn. R. App. P. 13(b), we must review the three aforementioned issues pursuant to Rule 36(b), which states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." A court will grant relief for plain error pursuant to Rule 36(b) only when: "(1) the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal

rule of law; (3) the error adversely affected a substantial right of the complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake." *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010) (citing *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000)). If any of these five criteria are not met, we will not grant relief, and complete consideration of all five factors is not necessary when it is clear from the record that at least one of the factors cannot be established. *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000). The party claiming plain error has the burden of persuading the appellate court. *State v. Banks*, 271 S.W.3d 90, 119 (Tenn. 2008).

### 1. Constitutionality of Drug-Free School Zone Act

The Defendant contends that the Drug-Free School Zone Act is unconstitutionally vague and unconstitutional as applied to his case. He asserts the statute is vague because it contains no clear indication whether a defendant violates the statute only when the actual drug sale occurs within 1000 feet of the school zone or whether a defendant violates the statute by simply entering and passing through a school zone on the way to a drug sale outside the 1,000 foot zone. Further, the Defendant asserts this statute is unconstitutionally vague when applied to him because he simply drove past the school zone on his way to a drug sale.

As previously stated, this issue was not preserved by the Defendant's original motion for new trial, and we must review it for plain error. A court will grant relief for plain error pursuant to Rule 36(b) only when, in addition to the other requirements, there is a breach of a clear and unequivocal rule of law. This Court has previously held that the Drug-Free School Zone Act is not overbroad or vague and, therefore, does not violate principles of due process guaranteed by the Fourteenth Amendment to the United States Constitution and article 1, section 8 of the Tennessee Constitution. *State v. Smith*, 48 S.W.3d at 159, 164-68 (Tenn. Crim. App. 2000); *State v. Jenkins*, 15 S.W.3d 914, 917-18 (Tenn. Crim. App. 1999). Further, more recently, this Court has held that the 2005 amendment to the Act was also constitutional. *State v. Devon Wiggins*, No. W2007-01734-CCA-R3-CD, 2009 WL 1362323, at *7-8 (Tenn. Crim. App., Jackson, May 15, 2009), *perm. app. denied* (Tenn. Dec. 21, 2009). Further, as previously discussed, in *Vasques* our Supreme Court held that driving through a school zone on the way to a drug sale was action sufficient to trigger the Drug-Free School Zone Act. 221 S.W.3d at 523. As previously stated, if any of the five criteria for plain error review are not met, we will not grant relief, and complete consideration of all five factors is not necessary when it is clear from the record that at least one of the factors cannot be established. *Smith*, 24 S.W.3d at 282-83. Accordingly, we conclude that the Drug-Free School Zone Act does not breach a clear and unequivocal rule of law and that this issue does not meet the requirements for plain error review.

### 2. Adequate Notice of Punishment Provisions of Drug-Free School Zone Act

The Defendant next contends that he did not have adequate notice of the enhanced punishment provisions of the Drug-Free School Zone Act. He asserts that the prosecution did not file a notice to seek enhanced punishment and that the indictment did not reference the Drug-Free School Zone statute. The State counters that it was not required to give the Defendant additional notice and that the indictment clearly indicated that the Defendant was charged with offenses that occurred "within one thousand (1,000) feet of real property that comprises a public elementary school . . . ."

Again, we may only review this issue for plain error. A court will grant relief for plain error pursuant to Rule 36(b) only when, in addition to the other requirements, there was a breach of a clear and unequivocal rule of law. *See Hatcher*, 310 S.W.3d at 808. In this case, we conclude there has been no such breach. The State is not required to give notice of intent to seek enhanced punishment when prosecuting a defendant pursuant to this statute. *See* T.C.A.40-35-202(a). Further, our review of the indictment indicates that it clearly indicated that the State was prosecuting the Defendant for crimes that occurred inside a Drug-Free School Zone. Because we conclude that there was no breach of a clear and unequivocal rule of law, we will not review this issue for plain error.

### 3. Prosecutorial Misconduct

Finally, the Defendant contends that the prosecutor committed prosecutorial misconduct when, during closing arguments, he twice stated:

> In this country, whether you are a citizen or not, you have a right to plead not guilty and ask for a jury trial, and that's our constitution in every criminal case, that is your right, whether you are a citizen of this country or not, and that's what we build the foundations of this country on.

As previously stated, a court will grant relief for plain error pursuant to Rule 36(b) only when: "(1) the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal rule of law; (3) the error adversely affected a substantial right of the complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake." *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010) (citing *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000)).

In determining whether a prosecutor's statements violated a clear and unequivocal rule of law, we first note that our supreme court has recognized that closing argument is a valuable privilege for both the State and the defense and that counsel is afforded wide latitude in presenting final argument to the jury. *See State v. Cribbs*, 967 S.W.2d 773, 783 (Tenn. 1998); *State v. Cone*, 665 S.W.2d 87, 94 (Tenn. 1984). However, a party's argument "must be temperate, predicated on evidence introduced during trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Middlebrooks*, 995

S.W.2d 550, 568 (Tenn .1999). This court, citing to standards promulgated by the American Bar Association,[1] has identified "five general areas of prosecutorial misconduct": (1) intentionally misstating the evidence or misleading the jury as to inferences it may draw; (2) expressing the prosecutor's personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant; (3) using arguments calculated to inflame the passions or prejudices of the jury; (4) using arguments that would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused or by predicting the consequences of the jury's verdict; and (5) intentionally referring to or arguing facts outside the record unless the facts are matters of public knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003). In addition, prosecutorial misconduct does not constitute reversible error absent a showing that it has affected the outcome of the trial to the prejudice of the defendant. *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001) (citing *State v. Chalmers*, 28 S.W.3d 913, 917 (Tenn .2000)).

When an appellate court finds an argument to be improper, "the established test for determining whether there is reversible error is whether the conduct was so improper or the argument so inflammatory that it affected the verdict to the Appellant's detriment." *Goltz*, 111 S.W.3d at 5 (citing *Harrington v. State*, 215 Tenn. 338, 385 S.W.2d 758, 759 (1965)). In measuring the prejudicial impact of an improper argument, this Court should consider the following factors: "(1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case." *Goltz*, 111 S.W.3d at 5-6 (citing *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); see *State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984).

We have reviewed the Defendant's allegations of prosecutorial misconduct in the context of the entire argument and are not convinced of plain error. We conclude that none of the statements "probably changed the outcome of the trial" and that the Defendant is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and the applicable authorities, we affirm the judgments of the trial court, save two. We reverse the judgment of conviction in Count 5, convicting the Defendant of selling more than 300 grams of cocaine, and order that Count 5 be merged into Count 4. The judgment of conviction in Count 4 should be entered with a notation that Count 5 was merged into Count 4. We reverse and dismiss with prejudice the

---

[1]*See* American Bar Association, ABA Standards for Criminal Justice: Prosecution Function and Defense Function §§ 3-5.8, 3-5.9 (3d ed.1993).

Defendant's conviction in Count 7 for possession with intent to sell .5 grams or more of cocaine. We again note that, per new case law, although the trial court corrected both of these errors when ruling on the Defendant's amended motion for new trial, that ruling by the trial court is a nullity. We also remand this case for entry of an amended judgment of conviction in Count 1 that reflects that the Defendant was convicted of a Drug-Free Zone offense by a check in that box on the judgment form. Any notation in the special conditions box indicating that the Defendant serve his entire sentence at 100% (as opposed to 15 years of his sentence at 100%) should be removed. In all other respects, the trial court's judgments are affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE